**UNITED STATES of America,**
**Appellee,**

v.

**Andrew PERROTTA, Defendant–**
**Appellant,**

**Santo Sirico, a/k/a Buddy, Defendant.**

**Docket No. 00–1799.**

United States Court of Appeals,
Second Circuit.

Argued: June 17, 2002.

Decided: Dec. 5, 2002.

Gerald L. Shargel, Law Office of Marc Fernich (Marc Fernich, Maurice Sercarz, on the brief), New York, NY, for Appellant.

Cynthia M. Monaco, Assistant United States Attorney for the Eastern District of New York (Alan Vinegrad, United States Attorney, David C. James and Peter A. Norling, Assistant United States Attorneys, on the brief), for Appellee.

Before: WINTER, F.I. PARKER, and POOLER, Circuit Judges.

POOLER, Circuit Judge.

Andrew Perrotta challenges his conviction under the Hobbs Act. He argues the government presented insufficient evidence at trial to prove the necessary jurisdictional nexus with interstate commerce because it showed only that the intended victim of the extortion was an employee of a company participating in interstate commerce. We agree this proof is not enough to satisfy even the *de minimis* standard of proof required to support a Hobbs Act conviction. We therefore reverse Perrotta's conviction.

## BACKGROUND

Andrew Perrotta and Gregg Marcus, former high school classmates, founded General Modernizer Home Construction Co., Ltd. ("GMHC"). The business flourished, and the two began several other partnerships, including, in 1993, Gettysburg Funding Corp., a mortgage brokerage firm that obtained loans for GMHC's clients. Eventually, Gettysburg generated more than $3 million in gross annual revenue.

In the early 1990s, Perrotta and Marcus came under federal investigation for unlawful practices, including the filing of false loan applications on behalf of GMHC customers. The two entered into a joint plea agreement. The agreement required one to plead guilty to one count of bank fraud and the other to plead guilty to one count of tax evasion. However, the plea agreement allowed Marcus and Perrotta to decide which partner would plead guilty to each count. Marcus pleaded guilty to tax evasion, while Perrotta pleaded guilty to the bank fraud plea. Perrotta contends the two were aware that whoever pleaded guilty to bank fraud would have to divest his shares in Gettysburg because of a New York law which forbids those convicted of bank fraud to work in the financial industry. According to Perrotta, he pleaded to bank fraud because Marcus was more heavily involved in the Gettysburg business. However, Perrotta argues, the two also agreed they would continue to split the partnership profits equally.

Marcus told Perrotta in February, 1998, that he wished to dissolve all of their partnership arrangements. Perrotta alleges that unknown to him, Marcus had been

negotiating with FHB Funding Corp.,[1] a national mortgage banking firm, concerning a takeover. Perrotta alleges that Marcus sold Gettysburg to FHB and refused to enter into any financial settlement to divide Gettyburg's assets. Marcus went to work at FHB in October 1998, and managed FHB's telemarketing arm. Tensions ran high, and there were fights between employees of GMHC and Gettysburg, as well as arguments and acts of vandalism. Perrotta sued Marcus in the summer of 1998 to recover his share of Gettysburg.

The government alleges that after a fruitless March 1999 meeting to settle the lawsuit,[2] Perrotta contacted Santo Sirico (a/k/a Buddy) to arrange an assault on Marcus. Sirico subcontracted the job to Vincent Scafidi, who was working off an illegal loan from Sirico. Scafidi testified his job was to "[m]ake sure [Marcus] gets a beating and break his legs." Instead, Scafidi went to the FBI, both to avoid assaulting Marcus and to avoid his loan payments. Scafidi wore a wire and tape recorded his meetings with Sirico. Sirico told Scafidi that Perrotta "needs to get this thing done because he had a meeting with this guy .... And this guy was like fucking making a jerk out of him. So he wants to get a message across with this fucking guy, you know what I'm saying?" In an April 13, 1999, phone call, Sirico told Scafidi that Perrotta also wanted Marcus's boss threatened so that Marcus would be fired from FHB.

The FBI told Marcus of the planned assault. Marcus agreed to act as if the assault actually occurred by wearing a sling and leg cast and spending several days home from work. At the direction of FBI agents, Scafidi called Sirico on April 11, 1999, and told him "it's done." Telephone records show that shortly thereafter, Sirico called Perrotta's home telephone number. Minutes later, a call was placed from Perrotta's home phone to a cellular phone belonging to Phillip Luizzo, a friend of Perrotta's. On April 13, 1999, Sirico called Scafidi and told him Perrotta was satisfied, and had paid him the promised $4,000.

Perrotta was indicted on one count of conspiring to "obstruct, delay and affect commerce" in violation of 18 U.S.C. § 1951(a) by extorting money from "an owner [Marcus] and employees of Gettysburg Funding Corp." A trial on that indictment ended in a mistrial on December 10, 1999. On February 9, 2000, the government obtained a superceding Hobbs Act indictment against Perrotta, but this time charged him with affecting commerce through a conspiracy to extort money from "an employee of FHB Funding Corp." The time frame of the indictment was narrowed to "[o]n or about and between March 1, 1999 and April 30, 1999, both dates being approximate and inclusive." On retrial, Perrotta moved for acquittal under Fed.R.Crim.P. 29, arguing the government did not prove an injury to Marcus would affect interstate commerce. The court denied the motion. Also at the second trial, government witnesses testified that FHB was a mortgage banking firm with clients located throughout the country; that Marcus ran a fifteen-to-twenty-person telemarketing unit; and even a one-day absence by Marcus would affect FHB's business. The judge did not permit Marcus to testify, despite protestations from defense counsel. The jury convicted Perrotta on the sole count of the indictment, and this appeal followed.

---

1. FHB later became eHome Credit Corp.

2. The lawsuit eventually settled sometime before Perrotta was sentenced in November 2000, with Marcus paying Perrotta $250,000.

## DISCUSSION

■ Perrotta attacks his conviction on a number of disparate grounds. As we accept his primary challenge—that the government failed to submit sufficient evidence to prove a nexus to interstate commerce sufficient to support Hobbs Act jurisdiction—we reverse his conviction solely on those grounds. Perrotta argues that at best, the trial proof showed only that he conspired to extort an employee of a company participating in interstate commerce. This, he argues, does not prove even a *de minimis* affect on interstate commerce. We hold that where the only connection to interstate commerce is that the victim works for a company engaged in interstate commerce, the link between the crime and interstate commerce is simply too attenuated to support federal Hobbs Act jurisdiction.

■ The Hobbs Act provides in pertinent part:

> [w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). Further, it is the law in our circuit that "[i]f the defendants' conduct produces any interference with or effect upon interstate commerce, whether slight, subtle or even potential, it is sufficient to uphold a prosecution under the Hobbs Act," *Jund v. Town of Hempstead,* 941 F.2d 1271, 1285 (2d Cir.1991).

We join our sister circuits in drawing a distinction between the extortion of an individual and the extortion of a business for the purposes of establishing Hobbs Act jurisdiction. *See United States v. Lynch,* 282 F.3d 1049, 1054 (9th Cir.2002) (distinguishing between the robbery and extortion of a business and the robbery and extortion of an individual under the Hobbs Act); *United States v. Wang,* 222 F.3d 234, 239 (6th Cir.2000) ("a small sum stolen from a private individual does not, through aggregation, affect interstate commerce merely because the individual happens to be an employee of a national company ...."); *United States v. Collins,* 40 F.3d 95, 100 (5th Cir.1994) ("[I]f the robbery of an individual were found to affect interstate commerce merely because of the real or perceived disruption of the individual's business by interfering with his work, the reach of section 1951(a) would be ubiquitous, and any robbery, in our closely-interwoven economy, arguably would affect interstate commerce."); *United States v. Buffey,* 899 F.2d 1402, 1406 (4th Cir.1990) ("Extorting money to be devoted to personal use from an individual does not affect interstate commerce."); *United States v. Mattson,* 671 F.2d 1020, 1025 (7th Cir. 1982) (drawing a nexus by linking an employee with a corporation's ability to purchase goods in interstate commerce "is too indirect.").

■ We are persuaded that the government must show something more than the victim's employment at a company engaged in interstate commerce to support Hobbs Act jurisdiction. It is true that "a showing of a very slight effect on interstate commerce" is sufficient to support Hobbs Act jurisdiction. *United States v. Arena,* 180 F.3d 380, 390 (2d Cir.1999) (quotations omitted). Even such a *de minimis* showing, however, is essential given that the Hobbs Act confers only limited jurisdiction on the federal courts for prosecutions of robberies or extortions. *See* 18 U.S.C. § 1951; *Arena,* 180

F.3d at 389 ("In a Hobbs Act prosecution, proof that commerce [w]as affected is critical since the Federal Government's jurisdiction of this crime rests only on that interference.") (alteration in the original) (quotation and citation omitted). The jurisdictional nexus transforms the quintessential state crimes of robbery and extortion into federal crimes. Thus, "a robbery or extortion that depletes the assets of a business operating in interstate commerce will satisfy the jurisdictional requirement of the Hobbs Act by a minimal showing of effect on commerce." *United States v. Jamison,* 299 F.3d 114, 120 (2d Cir.2002). Under this flexible standard, we approved Hobbs Act jurisdiction where the jurisdictional element was met by a showing of an indirect effect on interstate commerce. *See United States v. Elias,* 285 F.3d 183, 189 (2d Cir.2002) (sufficient to show the robbed grocery store sold goods produced outside of New York state); *United States v. Mapp,* 170 F.3d 328, 336 n. 13 (2d Cir. 1999) (same); *United States v. Jones,* 30 F.3d 276, 285 (2d Cir.1994) (using depletion of assets theory to support jurisdiction in a case where an undercover police officer was robbed of funds because the loss limited the amount of cocaine the officer could purchase in the future, and cocaine travels in interstate commerce). Even this flexible standard, however, does not permit Hobbs Act jurisdiction based on the facts before us. *See, e.g., Jamison,* 299 F.3d at 121–23 (Jacobs, *J.,* dissenting) (advocating adoption of a heightened jurisdictional standard when the Hobbs Act is applied to "the robbery of an individual at home").

Further, our holding here is consistent with the Supreme Court's holding in *Jones v. United States,* 529 U.S. 848, 852, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000). In *Jones,* the defendant was convicted under the federal arson statute, 18 U.S.C. § 844(i), of deliberately setting a fire which destroyed a house owned and occupied by his cousin. *Id.* at 851, 120 S.Ct. 1904. The statute reads in pertinent part:

> Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned ...

18 U.S.C. § 844(i). To support federal jurisdiction, the government argued the private residence targeted by Jones was used in activities affecting interstate commerce because (1) the homeowner used the house as collateral for a mortgage given by a lender in another state; (2) the homeowner used the house to secure homeowner's insurance from an insurer in another state and (3) the homeowner used the house to receive natural gas from source in another state. *Id.* at 855, 120 S.Ct. 1904. The Court found the house at question was neither used in interstate commerce nor in activities affecting interstate commerce, but instead the "owner used the property as his home, the center of his family life." *Id.* at 856, 120 S.Ct. 1904. The Court found the uses relied on by the government inadequate to support federal jurisdiction, noting "[w]ere we to adopt the Government's expansive interpretation of § 844(i), hardly a building in the land would fall outside the federal statute's domain." *Id.* at 857, 120 S.Ct. 1904. Here, as in *Jones,* adopting the standard advocated by the government would expand the reach of the Hobbs Act to include nearly every robbery or extortion committed.

■ There are instances where a robbery or extortion of an employee of a business engaged in interstate commerce would likely support Hobbs Act jurisdiction. The jurisdictional nexus could be

satisfied by showing that the victim directly participated in interstate commerce; *see United States v. Taylor*, 92 F.3d 1313, 1333 (2d Cir.1996) (noting that the victim's construction projects included airports, highways, and government buildings); that the victim was targeted because of her status as an employee at a company participating in interstate commerce; *see United States v. Diaz*, 248 F.3d 1065, 1089 (11th Cir.2001) (finding nexus where victims were targeted because of their connection to a business engaging in interstate commerce and when a direct effect on interstate commerce was shown due to a temporary closure of the business); that the harm or potential harm to the individual would deplete the assets of a company engaged in interstate commerce; *see Taylor*, 92 F.3d at 1333 (finding nexus where the extortionate activities depleted the funds available to the victims for the purchase of goods and supplies in interstate commerce); that the crime targeted the assets of a business rather than an individual; *see Collins*, 40 F.3d at 100 (explaining that criminal acts directed towards individuals are less likely to affect interstate commerce); *see also Jamison*, 299 F.3d at 120–21 (discussing whether this factor would indeed make it easier to prove the Hobbs Act nexus, but finding it unnecessary to reach the question given the facts presented); or that the individual was extorted of a sum so large, or targeted in connection with so many individuals, that the amount at stake cumulatively had some effect on interstate commerce; *see Jund*, 941 F.2d at 1285 (finding nexus where, while the impact from any single person was undoubtedly slight, the cumulative effect on interstate commerce from all those victimized by the scheme could have been very substantial). Merely showing employment with a company that does business in interstate commerce, without more, stretches the Hobbs Act too far. Under such a theory, the extortion or assault of anyone who worked in any capacity at any company that participates in interstate commerce would suffice for federal jurisdiction, blurring the boundaries between state and federal jurisdiction. *See Collins*, 40 F.3d at 100.

We need not decide if Hobbs Act jurisdiction would be appropriate if the jury heard evidence directly linking Perrotta's alleged extortion of Marcus to Marcus's employment at FHB. Here, the proof shows only that Perrotta conspired to assault Marcus because the two were embroiled in a bitter personal dispute. The government, in narrowing the indictment at the second trial, effectively foreclosed any possibility of a direct link between the dispute and Marcus's employment at FHB. Relying on its narrowed indictment to exclude evidence of this link, the government argued, "I don't see how the defense is going to be able to elicit competent evidence that this business dispute [between Marcus and Perrotta] had anything to do with the conspiracy charged, which begins in March of '99 and ends in April of '99." Throughout the trial, the judge essentially agreed with the government's logic.

At the first trial, the jury heard testimony that Perrotta's actions directly affected the operations of Gettysburg. The conspiracy allegedly caused Gettysburg employees to quit, compelled the company to hire a private investigator and security guards, inflicted the expense and disruption of moving and switching phone systems, damaged Gettysburg's reputation, and diverted Marcus's attention from work to collateral matters. The primary source for these allegations was the testimony of Marcus. More significantly, at the first trial, the jury also heard testimony suggesting that Marcus had essentially sold Gettysburg in exchange for a lucrative contract with FHB.

However, at the second trial, given the narrowed time frame of the superceding indictment and the government's opposition to testimony from Marcus, the jury heard little of this type of evidence. They did hear Gettysburg and FHB employee Jayne Naumann testify to some tension between Marcus and Perrotta, tension also described in the first trial. However, the government was evidently concerned that defense counsel, by suggesting that Marcus had profited at Gettysburg and FHB by taking advantage of Perrotta, would generate sympathy for defendant and dislike for the victim. Thus, the government resisted attempts to bring in more evidence about the dispute. Because of the narrow indictment and the government's own objections, the evidence at the second trial did not show, as the government argues, that the "dispute was connected to the victim's employment." *See, e.g., Diaz,* 248 F.3d at 1089 (affirming Hobbs Act conviction where "the Court [was] convinced by the evidence presented at trial that appellants targeted the Martins *because of* their interest in Rosa Medical Center."). Rather, the evidence shows Perrotta targeted Marcus as part of a personal vendetta because Perrotta believed Marcus took money that rightly belonged to Perrotta. The government's view of the interstate nexus during the second trial was that Marcus's *absence* from FHB, a business in interstate commerce, was sufficient.

At every opportunity, the government used the narrowed indictment to support evidentiary objections to events outside the time frame charged. This strategy ultimately led to very limited testimony on the background of Marcus's employment at FHB. At the first trial, the jury had access to Marcus's employment agreement with FHB. However, the judge excluded this exhibit at the second trial, and only allowed defense counsel limited leeway to question FHB executive Mark Rosenbloom about contractual terms like vacation and disability in order to cast doubt on the government's interstate commerce theory. The government objected to further evidence regarding Marcus's contract with FHB and decried defense counsel's "attempt to demonstrate that Mr. Marcus took advantage of Mr. Perrotta when he left the business." At the second trial, the jury did have access to copies of the complaint in defendant's lawsuit against Marcus. However, neither the original nor the amended complaint mentions Marcus's employment with FHB. The only evidence about the connection between Gettysburg and FHB heard by the jury in the second trial was that Marcus had worked for both, and that when asked if there were "a lot of old familiar faces [at FHB] from General Modernizer and Gettysburg," Gettysburg and FHB employee Naumann answered that there were "a few." In his opening argument, defense counsel did attempt to describe how Marcus, "taking [his] Rolodex with [him]," left to work for FHB. However, the judge instructed counsel, "Let's move along. Stick to what you propose to prove." And, in fact, since the judge did not permit Marcus to testify, defense counsel never did prove this connection. Therefore, no evidence permitted the jury, even drawing every reasonable inference in favor of the government, to discern any interstate commerce connection between Marcus's and Perrotta's dispute and Marcus's employment with FHB.

According to the testimony heard by the jury, Marcus's employment with FHB—the only basis for Hobbs Act jurisdiction—was merely fortuitous. Viewing the facts in the light most favorable to the government, the evidence shows only that Marcus, at a time well outside the scope of the indictment, had once been in business with Perrotta. The jury heard some evidence

from Naumann suggesting that the dispute that arose between the two men may have affected Gettysburg; however, even if we view the time frame charged in the indictment very broadly, the effect on Gettysburg falls well outside those dates. Thus, unlike in the first trial, the effect on Gettysburg cannot form the basis for Hobbs Act jurisdiction.

◼ With respect to the period charged in the indictment, the jury heard only that Marcus worked for FHB, a company engaged in interstate commerce. It did not hear evidence suggesting that Marcus's employment at that company arose because he had "sold" Gettysburg to FHB. Marcus's boss testified that Marcus missing one day of work would affect the company's ability to do business, but the testimony did not show that Marcus directly participated in interstate commerce, or even that the division Marcus worked in did business in interstate commerce every day. Further, the evidence showed that Marcus took time off from work for vacation. We are also unpersuaded by the government's argument that a connection to interstate commerce is shown because Perrotta's plan included having Marcus's boss threatened so that Marcus would be fired. There was no evidence heard by the jury that proves Marcus's direct involvement in interstate commerce, or that Marcus was targeted for any reasons other than personal ones. Thus, the connection to interstate commerce is simply too attenuated to support a Hobbs Act conviction.

## CONCLUSION

For the reasons given above, we find merely showing a victim of a Hobbs Act conspiracy, assault or extortion worked at a business engaged in interstate commerce is not enough to meet the *de minimis* showing required to support federal jurisdiction. We therefore reverse the conviction.