**UNITED STATES of America,**

v.

**Ramon ACOSTA, a/k/a "Arsenio Rodriguez," a/k/a "Juicy," and Manuel Melo, a/k/a "Gago," Defendants.**

No. 07 Cr. 1150 (VM).

United States District Court,
S.D. New York.

Jan. 16, 2009.

Michael Quinn English, United States Attorney, New York, NY, for Plaintiff.

## DECISION AND ORDER

VICTOR MARRERO, District Judge.

Defendants Ramon Acosta, a/k/a "Arsenio Rodriguez," a/k/a "Juicy" ("Acosta"), and Manuel Melo, a/k/a "Gago" ("Melo," and collectively, "Defendants"), were convicted at trial of charges related to a scheme to commit robberies, in violation of the Hobbs Act, 18 U.S.C. § 1951 (the "Hobbs Act"). Acosta and Melo each now move for a judgment of acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure ("Rule 29(c)"), arguing that

the evidence submitted by the Government was insufficient to support their convictions in several respects, including that: (1) venue does not properly lie in the Southern District of New York; and (2) various required elements to support convictions of conspiracy and robbery were not satisfied as a matter of law. For the reasons set forth below, Acosta's motion is DENIED and Melo's motion is GRANTED in part and DENIED in part.

## I. BACKGROUND

The Superseding Information S3 07 Cr. 1150(VM) (the "Information") charged Acosta with five counts, including: (1) Count One, which charged Acosta and Melo with participating in a conspiracy to commit Hobbs Act robberies from in or about early 2003, up to and including on or about November 11, 2006; (2) Count Five, which charged Acosta and Melo with participating in the gunpoint robbery of a victim in the vicinity of 92nd Street in Queens, New York, on or about April 28, 2004 (the "Queens Robbery"); and (3) Count Six, which charged Acosta with using, carrying, possessing, and brandishing a firearm during and in furtherance of the Queens Robbery.[1]

The Information charged Melo with five counts, including: (1) Count One; (2) Count Five; (3) Count Two, which charged Melo with participating in the attempted robbery of a victim in Yonkers, New York, on or about July 23, 2003 (the "Yonkers Robbery"); (4) Count Seven, which charged Melo with participating in the attempted robbery of a person whom he believed to be a narcotics dealer in New York, New York, on or about June 23, 2004 (the "Manhattan Robbery"); and (5) Count Eight, which charged Melo with using, carrying, and possessing a firearm during and in furtherance of the Manhattan Robbery.

After the Government rested its case-in-chief in Defendants' trial, Acosta and Melo made oral motions for acquittal pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure. (Tr. 855–62.) The Court denied these motions. (Tr. 863–64.) After the jury departed to deliberate, Melo renewed his application for a directed verdict of acquittal as to Counts Seven and Eight, which the Court denied. (Tr. 1303–06.) On October 27, 2008, the jury found Acosta guilty of Counts One, Five, and Six, and found Melo guilty of Counts One, Two, Five, Seven, and Eight.

Acosta now moves for a judgment of acquittal on the basis that the Government did not sufficiently prove that there was proper venue in the Southern District of New York as to Counts One, Five, and Six. Melo moves for a judgment of acquittal on the following bases: (1) as to Count Two, that Melo, at most, aided and abetted an attempted burglary on or about July 23, 2003 in the vicinity of Helena Avenue in Yonkers, not an attempted robbery; (2) as to Count Seven, that Melo did not aid or abet an attempted robbery in Manhattan because there was no effort to take property by the use of force or threat of violence; and (3) as to Counts One, Five, and Seven, the robberies and conspiracy did not have a de minimis effect on interstate commerce, as required under the Hobbs Act. Melo further contends that because the Government did not sufficiently prove a necessary element for each of the underlying robberies charged in the Information, the conspiracy charge in Count One and the firearms charge in Count Eight also must fall.

---

1. Acosta was found not guilty of Counts Two and Three contained in the Information. The Court therefore will not address those Counts with respect to Acosta.

## II. *DISCUSSION*

### A. *STANDARD FOR A RULE 29(c) MOTION*

■ "It is well settled that a defendant seeking to overturn a conviction based upon insufficiency of the evidence bears a heavy burden." *United States v. Santos,* 541 F.3d 63, 70 (2d Cir.2008) (*quoting United States v. Martinez,* 54 F.3d 1040, 1042 (2d Cir.1995)). This standard applies because a court must "review all of the evidence presented at trial 'in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government.'" *United States v. Walker,* 191 F.3d 326, 333 (2d Cir.1999) (*quoting United States v. Hernandez,* 85 F.3d 1023, 1030 (2d Cir. 1996)); *see also United States v. Reyes,* 157 F.3d 949, 955 (2d Cir.1998) (court must construe all permissible inferences in the Government's favor and resolve all issues of credibility in favor of the jury's verdict).

■ The conviction must be upheld if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Santos,* 541 F.3d at 70 (*quoting Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original)); *see also United States v. Bruno,* 383 F.3d 65, 82 (2d Cir. 2004) (court will not disturb a conviction unless no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (quotation marks omitted)); *United States v. Guadagna,* 183 F.3d 122, 130 (2d Cir.1999) (judgment of acquittal appropriate "only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt" (quotation marks omitted)). In analyzing the sufficiency of the evidence, the Court must look "to the totality of the government's case and not to each element, as each fact may gain color from others." *Guadagna,* 183 F.3d at 130; *see also United States v. Matthews,* 20 F.3d 538, 548 (2d Cir.1994) (court must affirm conviction "so long as, from the inferences reasonably drawn from the record as a whole, the jury might fairly have concluded that the defendant was guilty beyond a reasonable doubt").

■ The Government is not required "to preclude every reasonable hypothesis which is consistent with innocence." *United States v. Chang An–Lo,* 851 F.2d 547, 554 (2d Cir.1988); *see also Guadagna,* 183 F.3d at 130 ("[T]he government need not 'exclude every reasonable hypothesis other than that of guilt.'" (*quoting Holland v. United States,* 348 U.S. 121, 139, 75 S.Ct. 127, 99 L.Ed. 150 (1954))). Rather, "where 'either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter.'" *Santos,* 541 F.3d at 70 (*quoting United States v. Autuori,* 212 F.3d 105, 114 (2d Cir.2000)). The Court must exercise extreme caution "to avoid usurping the role of the jury when confronted with a motion for acquittal," remaining mindful that "it is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence." *United States v. Jackson,* 335 F.3d 170, 180 (2d Cir.2003).

### B. *VENUE*

#### 1. *Legal Standard*

■ "Both the Sixth Amendment and Federal Rule of Criminal Procedure 18 require that defendants be tried in the district where their crime was 'committed.'" *United States v. Matera,* 489 F.3d 115, 124 (2d Cir.2007) (*quoting United States v. Ramirez,* 420 F.3d 134, 138 (2d Cir.2005)). "[T]he venue requirement, de-

spite its constitutional pedigree, 'is not an element of a crime' so as to require proof beyond a reasonable doubt; rather, venue need be proved only 'by a preponderance of the evidence.'" *United States v. Rommy*, 506 F.3d 108, 119 (2d Cir.2007) (*quoting Ramirez*, 420 F.3d at 139).

■■■ The commission of some crimes can span several districts. "[W]here the acts constituting the crime and the nature of the crime charged implicate more than one location, the Constitution does not command a single exclusive venue." *United States v. Reed*, 773 F.2d 477, 480 (2d Cir.1985). "In such circumstances, Congress has instructed that venue properly lies in 'any district in which such offense was begun, continued, or completed.'" *Rommy*, 506 F.3d at 119 (*quoting* 18 U.S.C. § 3237(a) [2]); *see also United States v. Potamitis*, 739 F.2d 784, 791 (2d Cir. 1984). In other words, "[i]n a 'continuing offense,' where the acts constituting the crime and the nature of the crime charged implicate more than one location, venue is properly laid in any of the districts where an essential element of the crime took place." *United States v. Odunaike*, 273 Fed.Appx. 58, 60 (2d Cir.2008) (*quoting Ramirez*, 420 F.3d at 139 (quotation marks omitted)).

"Applying this rule to the continuing crime of conspiracy, this court has held that venue may lie in any district in which the conspiracy was formed or in any district in which a conspirator committed an overt act in furtherance of the criminal scheme." *Rommy*, 506 F.3d at 119–20; *see also United States v. Naranjo*, 14 F.3d 145, 147 (2d Cir.1994) ("In a prosecution for conspiracy, venue is proper in any district in which an overt act in furtherance of

the conspiracy was committed by any of the coconspirators. The defendant need not have been present in the district, as long as an overt act in furtherance of the conspiracy occurred there." (citations and quotation marks omitted)).

■■■ "When a defendant is charged in more than one count, the government must establish venue with respect to each count." *United States v. Maldonado–Rivera*, 922 F.2d 934, 968 (2d Cir.1990) (*citing United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir.1989)). With respect to Count Five, the robbery in Queens for which Acosta was convicted, "[v]enue under the Hobbs Act is proper in any district where interstate commerce is affected or where the alleged acts took place." *United States v. Stephenson*, 895 F.2d 867, 875 (2d Cir.1990) (*citing United States v. Reed*, 773 F.2d 477, 482 (2d Cir. 1985)); *see also United States v. Smith*, 198 F.3d 377, 383 (2d Cir.1999). As to Count Six, venue is proper under 18 U.S.C. § 924(c) in the district where venue is proper for the underlying crime. *See United States v. Rodriguez–Moreno*, 526 U.S. 275, 280, 119 S.Ct. 1239, 143 L.Ed.2d 388 (1999); *United States v. Speed*, 272 Fed.Appx. 88, 90–91 (2d Cir.2008) (transporting firearm through Southern District of New York satisfied venue); *United States v. Saavedra*, 223 F.3d 85, 90 (2d Cir.2000).

### 2. *Waiver of Objection to Venue*

■■■ Acosta argues that "there was not proper venue for this case to be prosecuted pursuant to Rule 18 of the Federal Rules of Criminal Procedure." (Defendant Acosta a/k/a Rodriguez Memorandum of Law in Support of Motion for Judgment of

---

**2.** The full text of 18 U.S.C. § 3237(a) provides: "Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed."

Acquittal, dated November 25, 2008 ("Acosta Mem."), at 3.) According to Acosta, "[t]he jurors apparently found that the only substantive criminal act [Acosta] participated in occurred within the Eastern District of New York," referring to the Queens Robbery. (*Id.* at 7.) Acosta thus concludes that because the Government charged Acosta with criminal activity in both the Southern and Eastern Districts of New York, and because the "jurors by their verdict rejected that there was any criminal conduct within" the Southern District of New York, the Court "must accept the jurors findings" in concluding that venue does not properly lie within this District. (*Id.* at 9.)

The Court disagrees. As a threshold matter, Acosta waived any challenge to venue by not raising a specific objection to venue until after the jury returned its verdict. This approach is implicit in Second Circuit case law, which requires that a defendant's objection to venue must be specifically articulated by the close of evidence. *See, e.g., United States v. Lester,* No. 96–1519, 1997 WL 321809, at *2 (2d Cir. June 13, 1997) (holding that under the Second Circuit's "longstanding doctrine," a defendant's failure to specifically object to venue at the close of evidence constitutes a waiver of objection to venue); *United States v. Mancebo–Santiago,* No. 96–1128, 1996 WL 560754, at *1 (2d Cir. Oct. 3, 1996) ("Because Mancebo–Santiago failed to challenge the proof of venue prior to the conclusion of the government's case, he waived his objection to venue."); *United States v. Menendez,* 612 F.2d 51, 54–55 (2d Cir.1979) ("[A] finding of waiver is proper ... when, after the government has concluded its case, the defendant specifies grounds for acquittal but is silent as to venue." (*quoting United States v. Price,* 447 F.2d 23, 27 (2d Cir.1971))); *United States v. Vinieris,* 606 F.Supp. 1390, 1396 (S.D.N.Y.1985) ("The failure of defense

counsel 'specifically [to] articulate [ ]' improper venue as a basis for a judgment of acquittal at the close of either the Government's or the entire case constituted a waiver of the issue ...." (*citing United States v. Grammatikos,* 633 F.2d 1013, 1022 (2d Cir.1980))).

Other federal Circuit Courts directly addressing the issue concur that a defendant who does not object to venue until after the jury returns its verdict has waived any such objection. *See, e.g., United States v. Carbajal,* 290 F.3d 277, 288–89 (5th Cir. 2002) ("Carbajal did not, however, raise a proper objection to venue before the jury's verdict and therefore waived this issue on appeal."); *United States v. Robinson,* 167 F.3d 824, 829 (3d Cir.1999) ("[B]y raising the issue for the first time after the jury reached a verdict, Robinson waived any objection to venue."); *United States v. Cordero,* 668 F.2d 32, 44 (1st Cir.1981) ("[C]ourts have consistently ruled that a claim of improper venue must be raised at least prior to a verdict."); *United States v. Boone,* 641 F.2d 609, 612 (8th Cir.1981) ("Boone made no objections to venue until after he was convicted."); *United States v. Powell,* 498 F.2d 890, 891–92 (9th Cir.1974) ("[V]enue may be waived, and where, as here, the objection was not raised until after the jury had returned its verdict of guilty, we find that waiver did in fact occur. A new trial on venue grounds raised after the jury has convicted gives the appellant a second bite at the apple to which he is not entitled under the circumstances here." (citations omitted)); *United States v. McMaster,* 343 F.2d 176, 181 (6th Cir.1965) ("[N]o objection having been made to venue prior to verdict, objection thereto was waived.").

The applicable case law thus uniformly holds that when a defendant fails to object to venue prior to the jury returning its verdict, any objection to venue has been

waived. Acosta's motion for a judgment of acquittal on the basis of improper venue must therefore be denied.

### 3. *Count One*

■ Even if Acosta had not waived his challenge to venue, the Court is persuaded that the Government nonetheless presented sufficient evidence for a rational trier of fact to conclude that venue exists in this District as to each of his convictions.

With regard to Count One, venue is proper in any district in which any co-conspirator committed an overt act in furtherance of the conspiracy. *See Rommy,* 506 F.3d at 119–20; *Naranjo,* 14 F.3d at 147. During Acosta's trial, the Government presented substantial evidence that overt acts in furtherance of the conspiracy took place in Manhattan and the Bronx, both of which are in the Southern District of New York. For example, Government witness Ramon Lopez ("Lopez") testified that he committed several robberies with Acosta in this District (Tr. 313–18), and that the plot to commit the Queens Robbery, and acts taken to further that robbery, took place in this District (Tr. 289–306). In addition, the Government presented evidence that numerous telephone calls were made between Acosta and Lopez regarding preparation for the Queens Robbery, including calls into Manhattan and the Bronx. (Tr. 292, 294–95; Government Ex. 111.) "It is beyond question that telephone calls can constitute overt acts in furtherance of a conspiracy." *Rommy,* 506 F.3d at 120; *see also Smith,* 198 F.3d at 382; *Naranjo,* 14 F.3d at 147. "In cases involving telephone calls between co-conspirators in different districts, we have ruled that venue lies 'in either district as long as the calls further the conspiracy.'" *Rommy,* 506 F.3d at 120 (*quoting Smith,* 198 F.3d at 382). The Court therefore concludes that the Government presented sufficient evidence for a rational trier of fact to reasonably conclude, based on a preponderance of the evidence, that venue exists in this District as to the conspiracy count against Acosta.

### 4. *Counts Five and Six*

■ Acosta also argues that venue does not properly lie within this District as to Count Five, the Queens Robbery, because "the jurors found that [Acosta] participated in one substantive criminal act whose venue is clearly within the [Eastern District of New York]." (Acosta Mem. at 10.) At base, Acosta argues that because the victim, Fernando Polanco ("Polanco"), was robbed in front of his house in Queens, venue for Count Five can exist only in the Eastern District of New York, and that is the end of the matter. (*See* Defendant Acosta a/k/a/ Rodriguez Reply Memorandum of Law in Support of Motion for Judgment of Acquittal, dated December 31, 2008 ("Acosta Reply Mem."), at 4, 6.)

The Court rejects Acosta's proposition that merely because the physical robbery took place in Queens, venue for that charge cannot lie in the Southern District. As discussed above, venue under the Hobbs Act "is proper in any district where interstate commerce is affected *or* where the alleged acts took place." *Stephenson,* 895 F.2d at 875 (emphasis added). The Court need not address the extent to which acts constituting the Queens Robbery took place in this District or if it was a "continuing offense," as long as interstate commerce was affected in this District as a result of the robbery. The Second Circuit has "long recognized that '[t]he jurisdictional requirement of the Hobbs Act may be satisfied by a showing of a very slight effect on interstate commerce. Even a potential or subtle effect on commerce will suffice.'" *United States v. Farrish,* 122 F.3d 146, 148 (2d Cir.1997)

(quoting *United States v. Angelilli,* 660 F.2d 23, 35 (2d Cir.1981)). While the Government still "must offer some evidence of an effect on interstate commerce," it "need only show a 'minimal' effect." *Id.* at 149 and n. 5; *see also United States v. Parkes,* 497 F.3d 220, 230 (2d Cir.2007) ("The Hobbs Act prohibits robberies that affect interstate commerce 'in any way or degree,' 18 U.S.C. § 1951(a); so the required showing of an effect on interstate commerce is *de minimis.*").

The Government presented sufficient evidence for a rational trier of fact to conclude, by a preponderance of the evidence, that the Queens Robbery had an effect on interstate commerce in this District. The Government presented evidence that Polanco was robbed of $10,000 worth of pre-paid telephone calling cards. (Tr. 85.) Polanco testified that he sold telephone calling cards to bodegas in Manhattan and the Bronx, and that he was discussing potential sales with customers immediately before the robbery. (Tr. 80–82, 84.) A rational trier of fact could reasonably conclude that the robbery of the pre-paid telephone calling cards left Polanco unable to sell them to vendors in the Southern District, leaving these vendors unable to sell the cards to their own customers in this District. Further, logic dictates, and a rational jury could reasonably find, that telephone calling cards are routinely used not only to conduct intrastate telephone calls, but also to conduct interstate and international telephone calls. Indeed, the parties stipulated that Polanco's telephone

calling cards could be used to place interstate and international telephone calls. (Tr. 795; Government Ex. 4.) Taken as a whole, the Government presented sufficient evidence for a rational trier of fact to conclude, by a preponderance of the evidence, that the robbery of the prepaid telephone calling cards in Queens had the requisite "very slight," "minimal," or "potential" effect on interstate commerce in this District. Venue is therefore proper in the Southern District of New York as to Count Five.[3]

Finally, because venue is proper as to the Hobbs Act crime of robbery charged in Count Five, venue is also proper as to the accompanying firearm crime charged in Count Six. *Rodriguez–Moreno,* 526 U.S. at 282, 119 S.Ct. 1239 ("Where venue is appropriate for the underlying crime of violence, so too it is for the § 924(c) (1) offense.").[4]

## C. *COUNT TWO: THE YONKERS ROBBERY*

### 1. *Legal Standard*

Melo argues that the Government did not adduce sufficient evidence from which a jury could reasonably conclude that he aided or abetted an attempted Hobbs Act robbery in Yonkers on or about July 23, 2003. Under § 1951(b) of the Hobbs Act, which provides the applicable definition of "robbery,"

The term "robbery" means the unlawful taking or obtaining of personal property

---

**3.** Melo argues that the Government did not adduce sufficient evidence of an effect on interstate commerce as to the conspiracy and robbery counts charged against him. Melo's challenges, however, go not to venue (which the Government must prove by a preponderance of the evidence), but to a substantive element of each crime (which the Government must prove beyond a reasonable doubt). The Court thus discusses Melo's interstate

commerce arguments below. *See infra* Part II.E.

**4.** While the underlying crime of violence in *Rodriguez–Moreno* was a "continuing offense" of kidnaping, there is no reason to conclude that the same analysis does not apply to any underlying Hobbs Act robbery for which venue is proper.

from the person or in the presence of another against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining. 18 U.S.C. § 1951(b).

 Under 18 U.S.C. § 2, one who aids or abets a crime may be punished as a principal. "To convict a defendant of aiding and abetting a given crime, the government must prove 'that the underlying crime was committed by a person other than the defendant, that the defendant knew of the crime, and that the defendant acted with the intent to contribute to the success of the underlying crime.'" *United States v. Huezo,* 546 F.3d 174, 179 (2d Cir.2008) (*quoting United States v. Reifler,* 446 F.3d 65, 96 (2d Cir.2006)). To establish that a defendant acted with the requisite specific intent to aid and abet the underlying crime, "the prosecution must prove the defendant knew of the proposed crime—suspicion that it might occur is not enough—and had an interest in furthering it." *United States v. Pipola,* 83 F.3d 556, 562 (2d Cir.1996); *see also Reifler,* 446 F.3d at 96 ("To prove that the defendant acted with that specific intent, the government must show that he knew of the crime . . . .").

 Count Two does not charge Melo with robbery, but with attempted robbery. "In order to establish that a defendant is guilty of an attempt to commit a crime, the government must prove that the defendant [1] had the intent to commit the crime and [2] engaged in conduct amounting to a 'substantial step' towards the commission of the crime." *United States v. Douglas,* 525 F.3d 225, 249 (2d Cir.2008) (*quoting United States v. Yousef,* 327 F.3d 56, 134

(2d Cir.2003)). A "substantial step" is more than "mere preparation," but may stop well short of "the last act necessary for the actual commission of the substantive crime." *Id.* (*quoting Yousef,* 327 F.3d at 134).

2. *Discussion*

 Melo argues that the Government did not adduce sufficient evidence from which a jury could reasonably conclude that he aided or abetted an attempted robbery in the vicinity of Helena Avenue in Yonkers on or about July 23, 2003. Specifically, Melo asserts that the Yonkers Robbery was actually an attempted burglary of what was supposed to be an empty house. According to Melo, when the owner of the house, Franklin Pimentel ("Pimentel"), unexpectedly returned, the participants fled or hid, and never attempted to use force or threats of violence to take property from the victim. (*See* Memorandum of Law in Support of Motion for Acquittal, dated November 26, 2008 ("Melo Mem."), at 4–5; Reply Memorandum of Law in Support of Motion for Acquittal, dated January 5, 2009 ("Melo Reply Mem."), at 2.)

The Government argues that it adduced sufficient evidence to support the jury's conclusion that Melo attempted to rob Pimentel, either as a principal or as an aider and abettor, in Yonkers on or about July 23, 2003, based both on events that took place on July 23 and on events that took place on July 21 and July 22, which the Government claims were "substantial steps" toward the events of the evening of July 23.

a. *The Events of July 21, 22, and 23, 2003*

According to evidence adduced by the Government, the robbery crew believed that Pimentel had over half a million dol-

lars in cash in his house, in a suitcase under his bed. (Tr. 426–27, 497.) At trial, Lopez testified that Melo drove Lopez, Luis Nunez ("Nunez"), and Humberto Suarez ("Suarez") to perform surveillance on Pimentel's house on Helena Avenue in Yonkers, on what the evidence indicates to have been July 21, 2003. (Tr. 320.) Melo also drove the crew to Manhattan and pointed out various bodegas that Pimentel owned. (Tr. 321.) The plan on that day was for the robbers to kidnap Pimentel as he came out of "one specific bodega [in Manhattan] that he would leave late at night." (Tr. 323.) They would then "take him to a place, take his keys, go to his house with the keys, go into the house, take the money and that way carry out the robbery in a calm fashion with no problem." (Tr. 322.) Lopez testified at trial that he had two guns with him that day, that Melo knew about the kidnaping plan, and that Melo knew Lopez had guns with him. (Tr. 322.) When Pimentel emerged from his bodega, however, someone was with him. (Tr. 322–23.) Because the crew had not planned to carry out a kidnaping of two people, they abandoned their plan for the evening. (Tr. 323.)

The next day, acting on a tip from Melo, the group of Lopez, Nunez, and Suarez went to kidnap Pimentel at a Bronx park, as he left a Softball game. (Tr. 323, 498–99.) The plan was thwarted, however, because "there were too many people around." (Tr. 323–24.) That evening, again acting on a tip from Melo, Lopez, Nunez, and Suarez went to Melo's aunt's bodega to attempt the kidnaping, but were again thwarted. (Tr. 324.)

Finally, the crew formulated a "new plan." (Tr. 324.) Melo informed the crew that Pimentel's family was "all in Santo Domingo," and that the house would be empty that evening. (Tr. 328.) They located a person named Davie, who specialized in opening and going through windows. (Tr. 324–25.) On the evening of July 23, 2003, Nunez drove Lopez, Suarez, and Davie to Pimentel's house and dropped them off. (Tr. 325–27, 499–500.) The group had two guns with them. (Tr. 327.) Davie forced open a window and entered the house. (Tr. 327, 500.) Just as Davie got inside, Pimentel unexpectedly arrived home. (Tr. 328, 500.) Lopez gave his gun to Davie and told him, "here. When he comes in, point the gun at him and tell him to freeze." (Tr. 328.) Davie did not follow these instructions, but instead hid inside the house. (Tr. 328, 500–01.) Pimentel made a call from a cell phone, and five minutes later the police arrived. (Tr. 328–29.) Davie, still hiding inside Pimentel's house, was arrested while the rest of the crew escaped. (Tr. 501, 784.) Lopez called Melo and told him what happened. (Tr. 329–30.)

b. *The Government Failed to Adduce Sufficient Evidence From Which a Rational Trier of Fact Could Reasonably Conclude that the Acts of July 21 and July 22, 2003 Were "Substantial Steps" Toward an Attempt to Rob Pimentel in Yonkers on July 23, 2003*

The Government argues that Melo's acts before the July 23, 2003 break-in at Pimentel's house establish sufficient evidence from which a rational juror could have reasonably concluded that Melo aided and abetted a Hobbs Act robbery. Under the Government's reasoning, Melo's participation in the plan to kidnap and rob Pimentel on July 21 and July 22 could have been viewed as "a substantial step towards the use of force or fear to take property from the presence of a victim." (Memorandum of Law in Opposition to Defendants' Post–Trial Motions, dated December 18, 2008 ("Gov't Mem."), at 17.)

The Court is not persuaded that the Government adduced sufficient evidence from which a rational juror could reasonably conclude that the attempts to kidnap and rob Pimentel on July 21 and July 22 were "substantial steps" toward the attempted robbery specified in Count Two of the Information. Count Two charges that on or about July 23, 2003, Melo "did attempt to commit robbery . . . in the vicinity of Helena Avenue in Yonkers, New York." While the acts of July 21 and July 22 may have constituted attempts to kidnap and rob Pimentel on those dates and at the locations in Manhattan and the Bronx involved, all evidence presented at trial supported no inference other than that the robbers' plan for the evening of July 23 was to break into Pimentel's empty house at Helena Avenue. Lopez testified to this new plan after declaring that the attempt to kidnap Pimentel from Melo's aunt's bodega on the evening of July 22, 2003 was unsuccessful:

Q. Can you tell us what happened?

A. It was becoming difficult for us to kidnap the man so we decided to switch plans.

Q. Did you formulate a new plan?

A. Yes, sir.

Q. What was the new plan?

(Tr. 324.) The "new plan" was to break into the house while it was empty on the evening of July 23, 2003—it was Melo who told the robbers that the house would be empty that evening. (Tr. 328.) Indeed, the "exact reason" that the crew decided to bring in Davie was that, as Melo had informed them, Pimentel's family was in Santo Domingo and "[t]here was nobody inside the house." (Tr. 328.)

Because Count Two specifies that Melo participated in an attempted robbery at Helena Avenue on or about July 23, 2003, and because the new July 23 plan was formed only after the failed attempts of July 21 and July 22 to kidnap and rob Pimentel, the Court finds that the Government failed to adduce sufficient evidence from which any rational trier of fact could reasonably conclude that the events of July 21 and July 22 were "substantial steps" toward the acts of the evening of July 23. At most, those were "substantial steps" toward a wholly different plan, the intent and substance of which were kidnaping and robbing. The Court therefore will restrict its analysis to the events relating specifically to the July 23 break-in to determine whether the Government adduced sufficient evidence such that a rational trier of fact could reasonably conclude that Melo participated in an attempted robbery that evening at Pimentel's house in Yonkers.

c. *The Government Failed to Adduce Sufficient Evidence From Which a Rational Trier of Fact Could Reasonably Conclude that Melo Had Sufficient Specific Intent to Aid and Abet an Attempted Robbery on the Evening of July 23, 2003*

The Court is persuaded that the Government did not adduce sufficient evidence from which a rational trier of fact could reasonably conclude that Melo intended to aid and abet a Hobbs Act robbery on the evening of July 23, 2003. First, as discussed above, the "new plan" was not to rob Pimentel but rather to break into his empty house and search for the cash; therefore, Melo at most aided and abetted an attempted burglary, not an attempted robbery as charged in Count Two.

Second, the presence of weapons at the attempted burglary does not automatically transform that attempted burglary into an attempted robbery. The Government notes that the Second Circuit has stated that "jurors are permitted to infer, based

on circumstantial evidence alone, that two or more of the defendants had a tacit understanding to use force or a threat of force." *United States v. Santos,* 449 F.3d 93, 103 (2d Cir.2006). (*See* Gov't Mem. at 14.) According to the Government, "[t]he possession of weapons by the robbers may lead to an inference of an intent to use force or a threat of force in the presence of a victim." (Gov't Mem. at 14–15 (*citing Santos,* 449 F.3d at 103–04).) The Government, however, fails to distinguish the context present in *Santos* that is absent in this case. In *Santos,* the defendants had a plan to steal drugs by impersonating government agents. 449 F.3d at 103. Three knives were found at the scene. In upholding a conspiracy conviction, the Second Circuit determined that a reasonable juror could have inferred from the totality of the circumstantial evidence "that there was a backup plan to steal the drugs at knifepoint." *Id.* In *Santos,* the defendants knew that they would be interacting with potential victims: "their plan was to steal by trick (impersonation of DEA agents), rather than by force." *Id.* at 95. Therefore, it was rational for a juror to infer that the presence of knives was circumstantial evidence that the defendants had a tacit understanding to use force or threat of force as a backup if the impersonation failed.

Also instructive is *United States v. Skowronski,* 968 F.2d 242 (2d Cir.1992). In *Skowronski,* the defendants were charged with robbing a store when only an "insider," the son of the store-owner, was present. The defendants argued that if the "victim" was a coconspirator and assisted in the theft, "the government could not prove that there was to be a robbery perpetrated by means of force or the threat of force as required by the [Hobbs] Act." *Id.* at 248. The Second Circuit disagreed, in part on the basis that the robbery was scheduled to take place during business hours when customers might have been present in the store and security guards were likely to be present. The Second Circuit concluded that because the defendants knew that security guards or customers could be present, a reasonable juror could infer that the defendants knew that some element of force would be necessary. *See id.*

Here, unlike in *Santos* and *Skowronski,* the Government never adduced any evidence that Melo (or any of the other crew members) expected anyone to be present at Pimentel's home during the break-in. The plan did not require interacting with non-participants, as in *Santos,* or even suggest a likelihood that non-participants would be present, as in *Skowronski.* To the contrary, the crew attempted the break-in on the evening of July 23, 2003 precisely because they thought the house would be empty and were taken by surprise when Pimentel returned. (*See* Tr. 328.)

The Court rejects the Government's invitation to hold that any attempted burglary in which one of the perpetrators carries a weapon would automatically create a reasonable inference that the perpetrator intended to use force or the threat of force to commit an attempted robbery, and that such attempt could then be charged against every member of the burglary crew—even one not present and not aware that the planned burglary may have unexpectedly converted into robbery or attempted robbery. If such were the case, any burglary in which one burglar happens to carry a weapon could automatically create a "reasonable" inference of an attempted robbery that, by reason of subsequent events, could be attributed to all other participants in the originally intended burglary. The Court does not agree that because Melo knew that other members of the burglary crew carried firearms to the

intended burglary in Yonkers, he "understood that this was to be a gunpoint robbery from the beginning" (Gov't Mem. at 18), particularly given that Melo and the other crew members, according to their plan, believed Pimentel's house would be empty. (*See* Tr. 328 ("That is the exact reason we decided to use the window guy because all [Pimentel's] family was in Santo Domingo. There was nobody inside the house.... Mr. Melo told us that they were all in Santo Domingo, that the house was empty."))

In addition, the Court notes that Melo was not at Pimentel's house or in the crew's van that evening. (Tr. 327.) When Pimentel unexpectedly arrived at his house, Lopez gave Davie a gun and told him to point it at Pimentel and tell him to freeze. (Tr. 328.) Even assuming that this act would constitute sufficient evidence to support a reasonable inference that Lopez or Davie attempted to rob Pimentel on the evening of July 23, 2003, this development has no bearing on Melo. To uphold Melo's attempted robbery conviction as an aider and abettor, the Government must prove that Melo "knew of the proposed crime—suspicion that it might occur is not enough." *Pipola*, 83 F.3d at 562. The Government did not adduce sufficient evidence that Melo had the requisite specific intent to aid and abet a *robbery* that evening; rather, the only reasonable conclusion that may be drawn from the evidence is that, at most, Melo had the specific intent to aid and abet a *burglary*. In short, the Government did not adduce sufficient evidence demonstrating that Melo knew, and not merely suspected, a robbery would take place on the evening of July 23, 2003. That Lopez or Davie may have undertaken their own actions to transform the burglary into a robbery or attempted robbery cannot attach sufficient specific intent for such an act to Melo.

Under these circumstances and in this context, the Court concludes that the Government did not adduce sufficient evidence from which a rational jury could reasonably conclude that Melo aided or abetted the attempted Hobbs Act robbery at Helena Avenue in Yonkers on the evening July 23, 2003. The Court therefore grants Melo's motion for a judgment of acquittal as to Count Two.

### D. *COUNT SEVEN: THE MANHATTAN ROBBERY*

Melo next argues that the Government did not adduce sufficient evidence from which a rational jury could reasonably conclude that Melo attempted to commit a Hobbs Act robbery in New York, New York on or about June 23, 2004. Specifically, Melo argues that with regard to Count Seven, the plan "was to take a car from a 'willing' victim, and not by force." (Melo Mem. at 5.)

At trial, the jury heard testimony that the Drug Enforcement Agency ("DEA") instructed confidential informants to pass along a rumor to Melo and his crew that a drug transaction would take place on June 23, 2004 in Manhattan—specifically, in a car holding 20 to 30 kilograms of cocaine. (Tr. 462–63.) The DEA took surveillance of the informants passing the information to Lopez. (Tr. 462.) The plan was for the person with the cocaine to let himself be robbed of the vehicle and cocaine. (Tr. 331.) One informant contacted Lopez to arrange a meeting of the crew to conduct the robbery (Tr. 464), and Lopez called Melo (Tr. 330). Lopez asked Melo to participate in the robbery, and Melo agreed. (Tr. 331.)

On June 23, 2004, the DEA observed Lopez, Melo, and other members of the crew meet with the informant. (Tr. 464–65.) After discussing the robbery for half

an hour, they moved to a Pathmark grocery store parking lot at 215th Street and Broadway, the location the DEA picked for the robbery sting and where the crew expected to find their "victim." (Tr. 465–66.) When everyone arrived, the informant approached Melo's car for a brief moment and left. (Tr. 467.) The DEA then emerged from their surveillance positions and the crew was placed under arrest. (Tr. 467.) In the crew's vehicles, law enforcement agents found a loaded .380 handgun, two knives, and a squirt gun wrapped in a sock. (Tr. 467.)

The Government contends, based on this evidence, that "it was clear that the participants in the crime that night were prepared to use force to take the drugs and potentially to fight off any others on the scene, including police." (Gov't Mem. at 19.) Melo counters that "[w]hat was attempted . . . was an attempt to steal property by having it handed to the participants without force." (Melo Reply Mem. at 4.) According to Melo, "there was no actual evidence that something did deviate from the plan of having a SINGLE 'willing' victim turn over the car (supposedly containing drugs) without fear, violence, or threat of violence," and thus "the evidence is not sufficient to support an attempted Hobbs Act robbery charge." (Melo Mem. at 8.)

The Court is persuaded that the Government adduced sufficient evidence from which a rational trier of fact could reasonably conclude that Melo committed or aided or abetted an attempted Hobbs Act robbery in New York, New York on or about June 23, 2004. The robbery was to take place at about 9:30 p.m. at a Path-

mark grocery store parking lot—a public space where customers could be present. In this manner, the Manhattan Robbery is similar to that in *Skowronski*, where the Second Circuit determined that there was sufficient evidence to maintain a conspiracy conviction for a Hobbs Act robbery where an "inside man" helped the defendants rob his jewelry store, based in part on the real likelihood that customers or security guards could be present during the crime. *Id.* at 248. In addition, Lopez sent Darling Duran ("Duran") to "check out the area . . . check it out for police and if everything looks okay." (Tr. 335–36.) A rational trier of fact could have concluded that Duran checked out the area because of the likelihood that law enforcement or others may be in the area and thus constituted a "substantial step" toward that attempted robbery. As the Circuit Court stated in *Skowronski*, "[t]he complicity of [one victim] thus did not mean that there would be no need for the use or threat of force against others." *Id.* at 248; *accord United States v. Rodriguez*, 54 Fed.Appx. 739, 745 (3d Cir.2002) (upholding Hobbs Act conviction involving an "insider" in part because the Government adduced sufficient evidence that the defendants brought more guns and ammunition than would otherwise have been necessary). In this case, a rational trier of fact could have reasonably concluded, based on the evidence presented, that the setting and circumstances of the Manhattan Robbery made it likely that a non-participant could stumble across the transaction.[5]

Additionally, a rational trier of fact could have concluded that Melo was not aware of the complicity of the "inside man" in the car that night. Lopez testified that he

---

**5.** These circumstances are in stark contrast to the Yonkers Robbery, where Melo was not present at the crime scene; the location was a private house and not a public space, where the presence of non-participants would be reasonably foreseeable; there was no evidence adduced that the group sent anyone out to look for police or other non-participants, and; the participants present at the crime scene carried fewer weapons.

"explained to [Melo] what we were going to do," and how they "intended to do the robbery." (Tr. 335). The crew, however, brought two vehicles, two knives, a handgun and a wrapped-up squirt gun. Based on the direct and circumstantial evidence presented at trial, and weighing every inference in the Government's favor, a rational jury could have reasonably concluded that any explanation of the robbery Melo received that night involved logistics and not the disclosure of the presence of an "inside man." [6] While Lopez's testimony could also be interpreted as indicating that he informed Melo that the "victim" was an inside man, the Court must weigh all inferences in the Government's favor and it is a reasonable inference that Lopez's vague testimony that he told Melo "what we were going to do" referred only to how the robbery would be conducted and not that he told Melo that the victim was an "insider." [7]

In sum, based on the entirety of the context and circumstances, the Court concludes that the Government adduced sufficient evidence from which a rational trier of fact could have reasonably concluded that Melo conducted an attempted robbery

on the evening of June 23, 2004 in New York, New York.[8] Because the Government adduced sufficient evidence to support the jury's finding as to Count Seven, the Court rejects Melo's request that the accompanying firearms charge in Count Eight be dismissed.

### E. *INTERSTATE COMMERCE*

 Melo next argues that the robberies in which Melo participated did not sufficiently affect interstate commerce, and thus warrant an acquittal of judgment on the robbery and conspiracy counts contained in the Information.

 The Court disagrees. As discussed above, the Second Circuit has "long recognized that '[t]he jurisdictional requirement of the Hobbs Act may be satisfied by a showing of a very slight effect on interstate commerce. Even a potential or subtle effect on commerce will suffice.'" *Farrish*, 122 F.3d at 148 (*quoting Angelilli*, 660 F.2d at 35); *see also Parkes*, 497 F.3d at 230 (under the Hobbs Act, "the required showing of an effect on interstate commerce is *de minimis*"). "[I]f the defendant's conduct produces any

---

6. For example, Lopez testified that when he met with Melo and others, "We talked about what we were going to do, the robbery, and how it was going to be done. I said to [Duran], you are going to take my Jeep with Jose. You are going to the parking lot, you are going to observe the area for police and look what it's like." (Tr. 418.)

7. Melo describes this possibility as "rank speculation." (Melo Reply Mem. at 6.) However, it is the Court's duty to review all evidence "in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government." *Hernandez*, 85 F.3d at 1030. Lopez's testimony that he told Melo "what we were going to do" (Tr. 335) is open to more than one reasonable interpretation, including that it was a discussion of logistics and not of the insider status of the victim. *See supra* n. 6.

8. Melo notes that both *Santos* and *Skowronski* involve the review of the sufficiency of evidence supporting a conviction for conspiracy to commit a Hobbs Act robbery, not a review of the sufficiency of evidence supporting a conviction for the underlying robbery. As to the Manhattan Robbery, however, Melo not only joined in a conspiracy to commit the robbery (which is covered in Count One), but substantial steps were taken in attempting the robbery. One member of the crew was sent out to perform surveillance. (Tr. 335–36.) When Melo was arrested, he was in the driver's seat of his car at the designated meeting place, and there were weapons found in the car. (Tr. 467.) The Government therefore satisfied its burden of sufficiently proving the requisite specific intent to commit the Manhattan Robbery.

interference with or effect upon interstate commerce, whether slight, subtle, or even potential, it is sufficient to uphold a prosecution under the Hobbs Act." *United States v. Perrotta,* 313 F.3d 33, 36 (2d Cir.2002) (quotation marks omitted); *see also United States v. Davila,* 461 F.3d 298, 306 (2d Cir.2006); *United States v. Elias,* 285 F.3d 183, 189–90 (2d Cir.2002).

With respect to the Queens Robbery, Lopez testified that Melo knew that Polanco was involved in the pre-paid telephone calling card business, and that Polanco was dealing with up to $70,000 in calling cards. (Tr. 290.) As Lopez testified, "[Polanco] buys them, he leaves them around the bodega, he collects his money. And then he repurchases them. He goes with all the money and goes where they sell him the cards to buy some more." (Tr. 290.) Melo said he would give the crew "the specific day when [Polanco] had the money and was going out to buy the cards." (Tr. 290.) On the day of the robbery, the thieves thought that the two stolen bags contained cash from the calling card business when in fact they contained the calling cards themselves. (Tr. 297–98, 303.) The crew sold the calling cards and split the profits. (Tr. 305–06.) Notably, the parties stipulated that Polanco's calling cards could be used to place interstate and international telephone calls. (Tr. 795; Government Ex. 4.)

Based on the above, the Court is persuaded that the Government adduced sufficient evidence from which a rational trier of fact could reasonably conclude that the Queens Robbery had the requisite effect on interstate commerce. The Second Circuit has repeatedly recognized that a robbery that interferes with interstate business dealings meets the requirement of an effect on interstate commerce for the purposes of the Hobbs Act. *See, e.g., United States v. Silverio,* 335 F.3d 183, 186–87 (2d

Cir.2003) (per curiam) (upholding Hobbs Act conviction of defendant who attempted to rob a doctor at his home believing he kept large amounts of cash from his medical practice there, because the robbery targeted his business funds and not personal funds); *Elias,* 285 F.3d at 188–89 (upholding Hobbs Act conviction based on robbery of neighborhood grocery store that sold products produced out of state, even though the products were obtained from in-state suppliers); *see also United States v. Jamison,* 299 F.3d 114, 121 (2d Cir.2002); *United States v. Mapp,* 170 F.3d 328, 336 n. 13 (2d Cir.1999).

Even though Polanco was robbed in front of his house, he was robbed of the products he sold as part of his business, which depleted the assets of the stores to which he sold, and those stores were engaged in interstate commerce. This easily satisfies the requirement that the Queens Robbery have an effect on interstate commerce. In addition, it is of no moment that the robbers thought they were stealing cash and not the pre-paid calling cards themselves. The Government adduced evidence that the robbers believed that Polanco was carrying cash in the bags for the purpose of going to purchase telephone calling cards. (Tr. 290.) Thus, the robbers specifically and knowingly targeted Polanco's business proceeds, not his personal finances. *See, e.g., United States v. Wilkerson,* 361 F.3d 717, 727–30 (2d Cir. 2004) (discussing cases and concluding that robbery of cash that would potentially deplete business assets satisfied interstate commerce requirement); *Perrotta,* 313 F.3d at 36.

Further, because the Queens Robbery supports the conspiracy charged in Count One, Melo's motion for a judgment of acquittal with respect to Count One on this basis is denied.[9]

---

9. Because the Court grants Melo's motion as to Count Two, the Court need not address

## III. *ORDER*

For the reasons stated above, it is hereby

**ORDERED** that the motion (Docket No. 61) of defendant Ramon Acosta, a/k/a "Arsenio Rodriguez," a/k/a "Juicy", for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 is DENIED; and

**ORDERED** that the motion (Docket No. 55) of defendant Manuel Melo, a/k/a "Gago", for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 is GRANTED as to Count Two and DENIED as to Counts One, Five, Seven, and Eight.

**SO ORDERED.**

whether the attempted robbery at Pimentel's house in Yonkers satisfied the interstate commerce requirement for a Hobbs Act conviction. In addition, aside from one sentence in the conclusion that "the defendant moves for a judgment of acquittal on counts two, five, and seven on the ground that the interstate commerce element has not been met on the facts presented by the government" (Melo Mem. at 11.), Melo provides no argument or rationale as to how the Government failed to adduce sufficient evidence as to the element of interstate commerce in Count Seven. In any event, the Court finds that there was sufficient evidence in the record from which a rational trier of fact could reasonably conclude that the attempted robbery specified in Count Seven could affect interstate commerce to the requisite degree.