# United States Court of Appeals
## For the First Circuit

No. 22-1867

UNITED STATES OF AMERICA,

Appellee,

v.

GRACE KATANA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Rikelman, Selya, and Howard,
Circuit Judges.

Daniel J. Cloherty, with whom Cloherty & Steinberg LLP was on brief, for appellant.

Randall E. Kromm, Assistant United States Attorney, with whom Joshua S. Levy, Acting United States Attorney, was on brief, for appellee.

February 22, 2024

**RIKELMAN, Circuit Judge.** Grace Katana appeals his conviction after a jury trial for conspiracy to interfere with interstate commerce by robbery in violation of 18 U.S.C. § 1951. He presents three interconnected arguments on appeal, all focused on his claim that the indictment charged him with conspiring to rob Joseph Wilson, whereas the government at trial proved only that he had conspired to commit a break-in at Wilson's home. Specifically, Katana argues that: (1) the district court's jury instructions and the government's arguments at trial constructively amended the indictment in violation of his Fifth and Sixth Amendment rights; (2) the government's evidence at trial amounted to a prejudicial variance of the charge set forth in the indictment; and (3) there was insufficient evidence to support his conviction. After careful consideration, we affirm.

## I. BACKGROUND

### A. The Indictment

In July 2019, Katana and three other individuals -- Junior Melendez, Keith Johnson, and Shaun Walker -- were charged with conspiring to interfere with interstate commerce by robbery in violation of the Hobbs Act, 18 U.S.C. § 1951. The indictment alleged that:

> From at least March 19, 2019 through March 25, 2019, in Worcester, Rockland, and elsewhere in the District of Massachusetts, . . . [Melendez, Johnson, Katana, and Walker] conspired with each other . . . to obstruct,

- 2 -

delay and affect interstate commerce and the movement of articles and commodities in commerce by the robbery of Person # 1, an individual residing in Rockland, Massachusetts who was engaged in the sale of custom glass smoking devices.

In May 2022, Melendez and Walker pleaded guilty, and the district court severed Johnson from the trial scheduled to begin later that month. Katana proceeded to trial, which took place over five days that spring.

## B. The Evidence

We recount the relevant facts as presented at trial "in the light most favorable to the jury's verdict, consistent with record support." United States v. Akoto, 61 F.4th 36, 38 (1st Cir. 2023).

In mid-March of 2019, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") initiated a court-approved wiretap of Melendez's cell phone.[1] During the course of its investigation, ATF intercepted numerous calls (some of which we detail below) and SMS text messages to and from one of Melendez's cell phones. Based on information gleaned from these calls and texts, ATF began to suspect that Melendez was preparing to commit a crime at a residence, with help from Katana, Johnson, and Walker. ATF ultimately learned that the target residence was located at 6

---

[1] ATF had been assisting the Worcester Police Department in an investigation of Melendez since the summer of 2018.

- 3 -

French Road in Rockland, Massachusetts, where an individual named Joseph Wilson was living with his then-girlfriend, Jennifer O'Brien. From that residence, Wilson operated a business, which he advertised online, selling ornate glassware for smoking tobacco and marijuana to customers in and out of Massachusetts. The estimated value of the glassware at 6 French Road in late March 2019 was approximately $40,000.

On March 18, 2019, ATF intercepted a phone call from Melendez to an individual named Tyrone Walker.[2] Melendez reported that he had "something for [Tyrone] and [Johnson] to do together" and asked whether he was interested. Tyrone answered affirmatively and indicated that he would talk to Melendez "about it" when he saw him in person.

The following day, Melendez told Johnson that he was waiting to "get . . . all the details" from Katana, who was out of town for the next few days.[3] After Melendez added "it is going to be you. . . . and [Shaun Walker]," Johnson responded: "I'd rather

---

[2] To avoid any confusion between Shaun Walker and Tyrone Walker, we refer to the latter as "Tyrone."

[3] Although Melendez did not explicitly mention Katana by name during this conversation, ATF agents believed that he was referring to Katana and that Katana was in California at the time.

take [Tyrone] though for the body.  It's more body."[4]  Melendez indicated they would "figure it out," but Johnson relented: "I'm going in first; it doesn't even matter."

Two days later, on March 21, Katana told Melendez that he would be arriving on a flight the next day, adding "we can do that shit Sunday if anything."  Katana asked if "it [was] a go," and Melendez responded: "Yeah, . . . they're all lined up."

On March 23, Melendez informed Johnson that they would be proceeding "tomorrow" and that Katana was "out there . . . getting the whole layout."[5]  Melendez also noted that "it's in the Bean,"[6] in "a rich, rich ass neighborhood."  When Johnson asked who was "in the crib," Melendez answered: "He's gonna let me know everything today" and "he's out there right now."  The following day, March 24, Melendez updated Johnson that the timing would be "around two, three in the morning."  After overhearing this conversation, ATF began constant physical surveillance of Johnson and Melendez.

---

[4] Tyrone and Johnson were both approximately six feet tall and over 200 pounds.  Walker was "much smaller than Tyrone," about 5'6" and under 180 pounds.

[5] As before, although Melendez did not reference Katana by name in this phone call, ATF agents believed he was referring to Katana.

[6] ATF agents assumed from this statement that Melendez was planning to target a residence in the Boston area.

On March 25 at approximately 1:42 a.m., Katana told Melendez: "I'm ready when you guys are. I'm about to be in Worcester." The two agreed to meet in a particular area of Worcester, and ATF agents followed Melendez there. About twenty minutes later, Melendez called Katana again and asked: "What are we doing, are we waiting until tomorrow?" After a brief exchange, Katana indicated that he had Wilson's "schedule" and added, "that's what I wanna show you, come get me and I'll show you and then we'll decide."[7] Melendez then decided that "2 or 3 in the morning is not really the best time to do it" and that he would "make them scope it out" and "make sure everything is right," noting that he wanted "to make sure they get away with it."

ATF continued physical surveillance of Melendez early that morning. At approximately 2:30 a.m., ATF spotted Melendez's black Dodge Charger, running with its headlights on, parked in front of a house on Bowker Street in Worcester for about five or ten minutes before leaving the area. Concerned that Melendez's plan was to target a residence on Bowker Street, ATF asked two members of the Worcester Police Department to sit on Bowker Street

---

[7] Katana suggests on appeal, as he did at trial, that he also said "he's in Maine," indicating that Katana believed Wilson was out of town. There is no basis for us to evaluate this claim on appeal, however, as the parties did not provide us with a copy of the recording itself, and the transcript of the call is unclear. As we will explain later, however, whether Katana believed that Wilson was in Maine at the time does not impact our ultimate holding in this case.

for the night.  At approximately 3:15 a.m., Worcester Police observed a parked sedan and Honda CR-V on that street.  Three middle-aged men emerged from one of the cars and loaded a dolly from one car to the other.

On the afternoon of March 25, at approximately 12:26 p.m., Katana arrived at Melendez's residence in Worcester.  About half an hour later, Johnson told Melendez that he was ready to be picked up and asked: "[Y]ou got the thing or I'm bringing mine?"  Melendez answered: "Well, we finding out right now.  He might not -- he probably not even there, so I'ma find out right now."  Melendez added: "Bring yours . . . just in case.  If you want.  Just bring one."  When Johnson asked if Melendez was "sure," Melendez instructed: "Bring one."  Shortly after this conversation, Melendez, Katana, and Johnson began driving east toward Boston.  Walker traveled in a separate car.

Eventually, Walker ended up at the parking lot of a Home Depot in Rockland, Massachusetts, about sixty miles from Worcester.  At approximately 2:48 p.m., Melendez called Walker and instructed: "Go in Home Depot.  We gonna go . . . see if . . . the whip and shit is there. . . . and come right back.  Go grab whatever we need, . . . a pry bar, whatever the fuck we need.  We'll be

right back. We're only three minutes from his house." A few minutes later, Melendez and Katana arrived at Wilson's residence.[8]

Wilson was not home at 6 French Road because he was on a snowboarding trip in Maine,[9] but O'Brien was. O'Brien's vehicle was parked in the driveway, and she was playing music "fairly loud[ly]" while waiting for her friend, Rachel Connors, to arrive. At around 2:53 p.m., Katana walked up to the residence and took some packages containing glassware that had been delivered to the front porch. Shortly after Katana left with the packages, Connors arrived and, as she neared the front door, could hear "pretty loud[]" music playing inside the residence, even though she was partially deaf.

Melendez and Katana then drove to the Home Depot in Rockland, less than half a mile from 6 French Road. At approximately 3 p.m., Melendez called Walker and asked where he was. Walker responded that he was in the Home Depot parking lot, but that he and Johnson "can't be going in and showin' our face." After Melendez indicated he was inside the Home Depot, Walker instructed him to "grab a crowbar" or "[w]hatever" Melendez thought was "going to work." Melendez then informed Walker: "There's one

---

[8] It is unclear at what point Johnson separated from Melendez and Katana.

[9] While Wilson was away in Maine, he posted on social media about his trip.

whip in the parking lot. . . . He went to the door. He not even . . . try to look in the window, but don't think anybody there anyways, with the light off so we're not sure. So he's trying to call his other man right now to see." (Second alteration in original). Melendez added that they were "gonna look" and "make the decision after that."[10] A few minutes later, Melendez and Katana purchased from Home Depot a yellow crowbar, serrated utility blades, and an eight-inch screwdriver.

Believing a crime was imminent, ATF and Massachusetts State Police descended on the Home Depot parking lot and found Melendez, Katana, Johnson, and Walker in two parked cars. Melendez was in a black Dodge Charger, with Katana "in [its] vicinity," and Walker and Johnson were in a Honda CR-V, which was registered to Katana's sister. Officers found a black ski mask in the Dodge Charger and the yellow crowbar, a large dolly, and a loaded firearm in the Honda CR-V. Officers arrested Johnson and Walker on state firearm charges but permitted Melendez and Katana to leave so that ATF could continue monitoring their communications and secure additional evidence against Melendez and his associates.

In June 2019, following further investigation, Katana and Melendez were also arrested.

---

[10] ATF understood Melendez to be referring to Katana and believed "one whip in the parking lot" referred to a car parked in the driveway at 6 French Road.

## C. Jury Instructions at Trial

At trial, the district court instructed the jury that, to convict Katana, it had to "be convinced that the government . . . prove[d] beyond a reasonable doubt that [he] agreed with one or more coconspirators" as follows:

> First, to knowingly and willfully obtain property from another person, in this case, Joseph Wilson;[11]
>
> Second, to obtain the property of Mr. Wilson by means of a robbery;
>
> And third, to obstruct, delay, or affect interstate commerce through the proposed robbery of Mr. Wilson.

The district court then provided the following definition of robbery:

> The term "robbery" means unlawfully taking or obtaining of personal property from the person or in the presence of another, against his or her will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his or her person or property, or property in his or her custody or possession, or in the person or property of a relative or member of his family or of anyone in his or her company at the time of the taking or obtaining.[12]

---

[11] The parties do not dispute that "Person # 1," the target of the robbery identified in the indictment, is Joseph Wilson.

[12] This definition largely quoted from the definition of robbery provided in the Hobbs Act:

> The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against

Additionally, the district court instructed the jury that the government had to prove beyond a reasonable doubt:

> First, that the agreement specified in the indictment, and not some other agreement . . . , existed between at least two people to commit a robbery of Mr. Wilson's property that would have had the effect of obstructing, delaying or affecting interstate commerce; and
>
> Second, that Mr. Katana willfully joined in that agreement.

## D. Closing Arguments, Verdict, and Motions for Acquittal

Katana and the government presented their closing arguments after the jury charge. The government argued that Katana had conspired with Melendez, Johnson, and Walker to "commit[] a robbery at 6 French Road, taking . . . Wilson's property in the process." It characterized "the crime that . . . Katana [was] charged with" as a "conspiracy to separate . . . Wilson from his property through the actual or threatened use of force to another person." The government reiterated this proposition later in its closing, noting that Katana had been "charged with conspiracy to interfere with interstate commerce by robbery; that is, that he

---

> his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

18 U.S.C. § 1951(b)(1).

agreed with at least one other person to unlawfully take the property here belonging to Joseph Wilson from another person through the actual or threatened use of force."

In his closing, Katana stressed that the issue before the jury was "whether the government . . . proved beyond a reasonable doubt that . . . [he] conspired to commit a robbery of Joseph Wilson," rather than simply "a break-in of a house" or an unlawful taking of Wilson's property. Katana argued that the evidence did not show that he agreed to rob Wilson or any other individual, because robbery is "a crime . . . committed against a person or in his presence" and there was no proof that Katana or his co-conspirators believed someone would be at 6 French Road at the time of the break-in. At most, Katana suggested, the government had proven a conspiracy to unlawfully take Wilson's property (in other words, larceny or theft) rather than, as charged in the indictment, a conspiracy to rob Wilson.

During its rebuttal, the government suggested that defense counsel was asking the jury to interpret the charge against Katana "far too narrowly" and explained that the conspirators targeted Wilson because of his business assets at 6 French Road -- namely, the "glassware worth $40,000." The government advised the jury to "use [their] common sense and . . . experience," noting that "when we talk about a robbery" -- for example, "[s]omebody robbed a gas station" -- "[i]t is the business

- 12 -

that is the target of the robbery." And in this case, the government explained, the target of the robbery was Wilson "because he was an individual who was running [his] business as a d/b/a" and it was "his property" that the conspirators sought. The government also stressed that, to meet its burden of proof, it "need only show that [the conspirators] agreed . . . to go into [Wilson's] house and use force . . . as necessary against any person inside that house to take [the] property that was owned by Joseph Wilson."

After the jury left to begin its deliberations, Katana objected to the government's rebuttal on the basis that it "amounted to a constructive amendment of the indictment and a variance because [it] advanced [a] theory of [Wilson's] business being a victim in a manner that [was] not set forth in the indictment." Katana subsequently moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a). He argued in the motion that there was insufficient evidence to establish that he: knew or believed Wilson or anyone else would be present at 6 French Road "at the time of the planned break[-]in"; agreed to commit a robbery of Wilson or anyone else; or agreed to obstruct, delay, or interfere with interstate commerce.

The next day, on June 7, the district court denied the motion, and the jury returned a guilty verdict. Katana then moved for a judgment of acquittal or, in the alternative, a new trial,

- 13 -

under Federal Rules of Criminal Procedure 29(c) and 33. He advanced two arguments in that second motion: (1) the district court's jury instructions and the government's arguments constructively amended the indictment; and (2) the government's evidence at trial amounted to a prejudicial variance. The district court denied the motion. This timely appeal followed.

## II. DISCUSSION

### A. Constructive Amendment and Prejudicial Variance

We review de novo Katana's preserved claims of constructive amendment and prejudicial variance. See United States v. Godfrey, 787 F.3d 72, 78 (1st Cir. 2015). To conduct this review, we read the indictment "'in a plain and commonsense manner,' focusing on the text and what it reveals about the scope of the crimes the grand jury intended to charge." United States v. Martínez, 994 F.3d 1, 13 (1st Cir. 2021) (quoting United States v. Mubayyid, 658 F.3d 35, 70 (1st Cir. 2011)).

#### 1. The Distinction Between the Two Doctrines

A constructive amendment occurs when the government's evidence or arguments or the court's jury instructions alter the terms of an indictment such that the defendant is effectively charged with a different offense than the one returned by the grand jury. See Akoto, 61 F.4th at 43. Our law prohibits constructive amendments to safeguard multiple constitutional guarantees for individuals charged with a crime: the Fifth Amendment right to be

- 14 -

indicted only by a grand jury and the Sixth Amendment rights to be informed of those charges and not to be re-prosecuted for the same offense. See id.; United States v. Taylor, 848 F.3d 476, 495 (1st Cir. 2017). "When the challenge is preserved, '[a] constructive amendment is considered prejudicial per se and grounds for reversal of a conviction.'" United States v. Andino-Morales, 73 F.4th 24, 39 (1st Cir.) (alteration in original) (citation omitted), cert. denied, 144 S. Ct. 370 (2023).

A variance, by contrast, does not involve a change in the offense charged in the indictment. United States v. Vega-Martínez, 949 F.3d 43, 51 (1st Cir. 2020). Rather, a variance occurs when the government relies at trial on different facts than those alleged in the indictment to prove the same offense. United States v. Ramos-Baez, 86 F.4th 28, 56 n.3 (1st Cir. 2023). A variance does not require reversal unless "it affects the defendant's substantial rights, i.e., the right to have knowledge of the charge sufficient to prepare an effective defense and avoid surprise at trial, and the right to prevent a second prosecution for the same offense." Vega-Martínez, 949 F.3d at 51 (cleaned up).

The Supreme Court's decision in Stirone v. United States, 361 U.S. 212 (1960), is often cited as the seminal case on constructive amendments. In Stirone, a grand jury indicted the defendant on a charge of interfering with Pennsylvania's inbound

- 15 -

sand trade in violation of the Hobbs Act. See id. at 213. But at trial, the government presented evidence, over the defendant's objection, that he also interfered with the state's outbound steel trade in violation of the Hobbs Act, and the district court instructed the jury that it could convict on either ground. See id. at 214. The Supreme Court found that the "variance" between the indictment, on the one hand, and the jury charge and the government's proof, on the other, "destroyed the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury." Id. at 217. The Court stressed that "after an indictment has been returned[,] its charges may not be broadened through amendment except by the grand jury itself," id. at 215-16, and "[a]lthough the trial court did not permit a formal amendment of the indictment, the effect of what it did was the same," id. at 217. It therefore reversed the defendant's conviction. See id. at 219.

Several years later, the United States Court of Appeals for the D.C. Circuit suggested that the Stirone Court had found that the variance between the grand jury's charge and the proof at trial was "substantial enough to amount to a constructive amendment of the indictment." Gaither v. United States, 413 F.2d 1061, 1072 (D.C. Cir. 1969). Courts across the country (ours included) then began discussing Stirone as a case of constructive amendment. See United States v. Withers, 960 F.3d 922, 935 (7th Cir. 2020)

- 16 -

(Easterbrook, J., concurring) ("[E]very court of appeals . . . has used the 'constructive amendment' language, which has appeared in at least 1,900 appellate opinions."); see, e.g., United States v. Portela, 167 F.3d 687, 702 (1st Cir. 1999) (characterizing Stirone as "the case establishing that jury instructions can work a constructive amendment").[13]  Uncertainty by litigants in identifying the dividing line between a constructive amendment and a prejudicial variance ensued.  See, e.g., United States v. Rosario-Pérez, 957 F.3d 277, 289 (1st Cir. 2020) (explaining that it was "unclear whether [defendant's claim] would be described more appropriately as [alleging] a variance from the indictment" rather than a "constructive amendment"); United States v. Bucci, 525 F.3d 116, 131 (1st Cir. 2008) (noting that defendant had "conflate[d] his constructive amendment argument with his variance claim" and proceeding to "address them simultaneously" to avoid "a futile endeavor to parse the two").  Recognizing this challenge, we have noted that "[t]he line between 'the crime charged' and 'the facts charged' is inherently fuzzy."  Mubayyid, 658 F.3d at 51 (quoting United States v. Mueffelman, 470 F.3d 33, 38 (1st Cir. 2006)).

To bring greater clarity to this area of law, we have held that "[t]he rule against constructive amendments . . . is

_____

[13] See also 3 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 516 (5th ed. 2023).

focused not on particular theories of liability but on the offenses charged in an indictment." United States v. Simon, 12 F.4th 1, 35 (1st Cir. 2021) (second alteration in original) (citation omitted); see, e.g., Mueffelman, 470 F.3d at 38 (rejecting constructive amendment argument where "the titular crime was not altered," as the defendant "was charged with mail fraud and convicted of mail fraud"); United States v. Fisher, 3 F.3d 456, 463 (1st Cir. 1993) (holding same because "[t]he evidence admitted against [defendant] pertained directly to" the offenses in the indictment "and to no other[] charges"). Thus, "[o]ur practice has been to look to statutory elements in response to claims by defendants that 'the crime charged' has been changed." Simon, 12 F.4th at 34 (quoting Mubayyid, 658 F.3d at 51).

Accordingly, to succeed on a constructive amendment argument under our precedent, a defendant generally must show that the proceedings altered the indictment with respect to a "statutory element[] of the offense." United States v. López-Díaz, 794 F.3d 106, 118 (1st Cir. 2015) (concluding that court's refusal to instruct jury that government needed to prove charged conspiracy's success did not constructively amend indictment because a conspiracy's success is not an element of charged offense). For example, in United States v. Dowdell, 595 F.3d 50 (1st Cir. 2010), we considered whether a "district court's modification of the indictment to reflect distribution of 'cocaine base' rather than

- 18 -

'cocaine'" constituted a constructive amendment. Id. at 66. In rejecting the defendant's constructive amendment claim, we explained that, "[b]ecause [he] was prosecuted under § 841(a)(1), which prohibits distribution of any controlled substance regardless of type, drug identity had no bearing on the substance of the charge." Id. at 68. Thus, "the government could technically have omitted reference to a particular controlled substance altogether." Id.

In the terminology of our modern jurisprudence, then, Stirone is more appropriately characterized as a prejudicial variance case, rather than a constructive amendment case. The offense charged in Stirone, a violation of the Hobbs Act, was the same offense on which the government presented evidence and on which the district court instructed the jury. See 361 U.S. at 213-14. The issue was that the government's arguments and the court's instructions presented "to the jury two different theories under which the defendant could be found guilty of violating the Hobbs Act, either of which could have independently supported a conviction under the Act," even though "the government had specified only one of those theories in the indictment." United States v. de Leon-De La Rosa, 17 F.4th 175, 197 (1st Cir. 2021) (emphases added); accord Mubayyid, 658 F.3d at 50 (characterizing Stirone as "holding that an indictment was unconstitutionally broadened where prosecution offered evidence of two theories of

- 19 -

liability, but the grand jury indicted defendant only on the first theory" (emphasis added)). Thus, although "the evidence adduced at trial prove[d] different facts than those alleged in the indictment," the elements of the offense remained the same. Ramos-Baez, 86 F.4th at 56 n.3 (citation omitted); see United States v. Mojica-Baez, 229 F.3d 292, 310 (1st Cir. 2000) (explaining that, in Stirone, the government introduced "evidence of a different set of facts" than those alleged in indictment). That is a variance under our case law. See Ramos-Baez, 86 F.4th at 56 n.3; Simon, 12 F.4th at 34; Vega-Martínez, 949 F.3d at 51; United States v. Mangual-Santiago, 562 F.3d 411, 421 (1st Cir. 2009). And the variance in Stirone was so great -- as the facts underlying the two theories were entirely different -- that the Court had little difficulty concluding that it was prejudicial because it "destroyed the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury." 361 U.S. at 217.

    With this framework in mind, we turn to Katana's constructive amendment and prejudicial variance claims.

### 2. Katana's Constructive Amendment Claim

    Katana's constructive amendment claim is based on the premise that the grand jury charged him with a conspiracy to rob Wilson and not "any other person" (such as O'Brien) or "any business entity" (such as Wilson's business) "in the presence of

others."[14]    He  points  to  the  indictment's  language  alleging  a conspiracy  to  commit  a  "robbery  of  Person  #  1,  an  individual residing  in  Rockland,  Massachusetts  who  was  engaged  in  the  sale  of custom  glass  smoking  devices."  (Emphasis  added.)

Based  on  his  interpretation  of  the  indictment,  Katana challenges  the  district  court's  "use  of  the  phrase  'the  property of'  in  its  jury  [charge],"  including  its  instruction  that  the government  had  to  prove  that  he  agreed  "to  obtain  the  property  of .  .  .  Wilson  by  means  of  a  robbery."   (Emphasis  omitted.)   These instructions,  Katana  argues,  not  only  "misstated  the  agreement charged  in  the  indictment"  but  also  "created  a  substantial  risk that  the  jury  could  convict  [him  even]  if  [it  found]  he  agreed only  to  conduct  that  amounted  to  a  mere  'larceny'  of  .  .  .  Wilson's property,  rather  than  .  .  .  a  'robbery'  of  .  .  .  Wilson  himself." He  also  asserts  that  "the  district  court's  repeated  insertion  of the  phrase  'or  her'  in  its  definition  of  the  term  'robbery'" exacerbated  "these  erroneous  instructions"  because  it  "suggest[ed] to  the  jury  that  the  planned  robbery  need  not  have  been  a  'robbery' of  .  .  .  Wilson,  despite  the  plain  language  of  the  indictment."

---

[14] Katana  acknowledges  that  the  grand  jury  "may  well  have been"  able  to  charge  him  for  conspiring  to  rob  Wilson's  business on  the  facts  underlying  his  case,  but  he  argues  that  because  it did  not  do  so,  the  government  could  not  prosecute  him  under  that theory  at  trial.   For  reasons  we  explain  momentarily,  we  disagree.

Katana presents a similar theory with respect to the government's evidence and arguments at trial. He focuses in particular on the government's statements that: "Katana [had been] charged with . . . conspir[ing] to separate Joe Wilson from his property through the actual or threatened use of force to another person" or, phrased slightly differently at another point, "to unlawfully take the property . . . belonging to Joseph Wilson from another person through the actual or threatened use of force"; and that "[i]t [was] the business that [was] the target of the robbery."

As we explain in further detail below, we reject for three reasons Katana's claim that the court's jury charge and the government's arguments constructively amended the indictment. First, the offense charged in the indictment -- a conspiracy to commit a robbery in violation of the Hobbs Act -- was the same offense on which the court instructed the jury and on which the government presented evidence. The trial transcript contradicts Katana's theory that the government's arguments and the jury charge suggested to the jury that it could convict him of a conspiracy to commit a larceny. Second, contrary to Katana's contention, a commonsense and plain reading of the indictment indicates that Wilson was targeted in connection with his business. Third, the government's focus at trial on Wilson's home business as the target of the robbery did not amount to a constructive amendment because

the identity of the target is not an element of a robbery or conspiracy to commit robbery under the Hobbs Act.

To begin, the district court's instructions -- which we evaluate "not in isolation but in the context of the entire charge" -- were clear that Katana was charged with, and could be convicted of, only a conspiracy to commit robbery in violation of the Hobbs Act.  United States v. McBride, 962 F.3d 25, 33 (1st Cir. 2020) (quoting Jones v. United States, 527 U.S. 373, 391 (1999)).  The instructions described the essential elements of a conspiracy to commit a Hobbs Act robbery as set out in 18 U.S.C. § 1951.  See supra, Part I(C); cf. United States v. Cruzado-Laureano, 404 F.3d 470, 480 (1st Cir. 2005) (listing similar elements for Hobbs Act extortion).  The district court was explicit that the property at issue in the charged conspiracy was Wilson's, as it explained that the property had to be "obtain[ed] . . . by robbery from . . . Wilson."  There is no dispute that Wilson was an owner of the business he operated from his residence, and we are not persuaded that those assets connected to Wilson's business are not also his property.  Additionally, the court's definition of robbery (which is nearly identical to that provided in the Hobbs Act) made clear that the government had to prove that Katana conspired to take property unlawfully "from the person or in the presence of another, against his or her will, by means of actual

or threatened force, or violence, or fear of injury."[15] (Emphasis added.)

The fact that the instructions added "or her" and thus "did not parrot the statutory definition" of a Hobbs Act robbery does not mean that they "were legally inconsistent with that definition." Andino-Morales, 73 F.4th at 39-40. Indeed, "the method and manner in which" a district court "inform[s] the jury about the applicable law" is left "within wide limits" to its discretion. Id. at 40 (citation omitted). It is also worth noting that the First Circuit's Model Pattern Jury Instructions use the same "his or her" phrasing (likely because it better reflects gender parity) in the suggested definition of robbery. See Pattern Crim. Jury Instrs. for the Dist. Cts. of the First Cir.,

_____

[15] We briefly note here Katana's argument that "[f]ederal courts have repeatedly explained that the term 'robbery' in the Hobbs Act is to be interpreted in a manner that is consistent with the common law definition of 'robbery': the unlawful taking of property from the person of or in the presence of the victim." At common law, he explains, robbery is "an offense against a person" whereas larceny or theft is an "offense[] against property." We note, however, that "the principal distinguishing characteristic" of a robbery as compared to a larceny is "the exertion of force." United States v. Rodriguez, 659 F.3d 117, 118 (1st Cir. 2011) (quoting Commonwealth v. Jones, 283 N.E.2d 840, 843 (Mass. 1972)); see also 18 U.S.C. § 1951(b)(1) (defining robbery as taking property "by means of actual or threatened force, or violence, or fear of injury"). Here, the definition of robbery in the jury charge included the exertion of force, which further undermines Katana's argument that the court instructed the jury on a larceny charge.

- 24 -

§ 4.18.1951 (2022) (Interference with Commerce by Robbery or Extortion (Hobbs Act), 18 U.S.C. § 1951).

For similar reasons, we also find that the government informed the jury that the offense at issue was a conspiracy to commit a Hobbs Act robbery. For example, the government stated in its closing argument that Katana was "charged with conspiracy to interfere with interstate commerce by robbery; that is, that he agreed with at least one other person to unlawfully take the property here belonging to . . . Wilson from another person through the actual or threatened use of force." In its rebuttal, the government noted that it "need only show that [the conspirators] agreed . . . to go into [Wilson's] house and use force . . . as necessary against any person inside that house to take [the] property that was owned by . . . Wilson." With these and other statements, the government made clear to the jury that its burden of proof required it to show that the conspirators believed someone (though not necessarily Wilson)[16] might be home at the time of the planned robbery and that the conspirators were prepared to use force if necessary. After careful review, we find no support in the record for Katana's claim that the government suggested that

---

[16] As we explain below, the government was not required to prove that the conspirators believed Wilson in particular would be home at the time of the planned robbery.

- 25 -

the jury could convict him of conspiring to commit what amounted to a "mere" larceny.

Moving to Katana's next argument about the scope of the indictment, we reject his claim that the only reasonable reading of the indictment is that it charged a robbery of Wilson himself, untethered from his business. To be sure, the indictment in this case "is not a model of clarity." United States v. Rodríguez-Rodríguez, 663 F.3d 53, 55 (1st Cir. 2011). However, when we adopt the requisite commonsense reading of the indictment, we conclude that its inclusion of the phrase "an individual . . . who was engaged in the sale of custom glass smoking devices" is enough to indicate that Wilson was identified as the target of the robbery in connection with his business. Katana disagrees, arguing that the government included that language simply to establish the interstate commerce element of the offense. But the interstate commerce element is addressed earlier in the indictment, when it alleges that Katana conspired "to obstruct, delay and affect interstate commerce and the movement of articles and commodities in commerce by the robbery of Person # 1." Certainly, the language about Wilson's glassware business further supported the interstate commerce element, but Katana provides no reason why it could not serve the additional purpose of putting him on notice that the government would focus on the taking of Wilson's business assets as the object of the conspiracy.

Finally, we note that Katana admitted at oral argument that he could cite no case law suggesting that robbery of an individual is a different offense than robbery of that individual's home business. And, as Katana further conceded, "the identity of the target[] of a Hobbs Act conspiracy is not an element of that conspiracy." United States v. Mulder, 273 F.3d 91, 115 (2d Cir. 2001) (addressing verdict unanimity in Hobbs Act extortion conspiracy); see also López-Díaz, 794 F.3d at 118 (rejecting constructive amendment claim because "[t]here was no change to the statutory elements of the offense"); United States v. Fornia-Castillo, 408 F.3d 52, 66 (1st Cir. 2005) (same). See generally 18 U.S.C. § 1951. Thus, a focus on Wilson's business as the target at trial did not amount to a constructive amendment.

Katana's reliance on United States v. de Leon-De La Rosa, 17 F.4th 175 (1st Cir. 2021), does not support his constructive amendment theory. There, an indictment charged the defendant with violating 46 U.S.C. § 70503(a)(2) and 21 U.S.C. § 881(a) by "'knowingly and intentionally destroy[ing] property subject to forfeiture' -- specifying that the 'subject property' was a 'controlled substance.'" De Leon-De La Rosa, 17 F.4th at 197 (alteration in original). Importantly, § 70503(a)(2) prohibits an individual aboard a covered vessel from knowingly or intentionally destroying property subject to forfeiture under § 881(a). Section 881(a), in turn, delineates several categories of forfeitable

- 27 -

property, including controlled substances, see 21 U.S.C. § 881(a)(1), and equipment used to deliver controlled substances, see id. § 881(a)(2). The district court "instruct[ed] the jury that it could find [the defendant] guilty if it found beyond a reasonable doubt that 'the property was a controlled substance or equipment used for delivering controlled substances.'" De Leon-De La Rosa, 17 F.4th at 197. We concluded that this constituted a constructive amendment because it broadened the crime charged by permitting the jury to convict under § 881(a)(1) or § 881(a)(2), even though the indictment directly quoted only from § 881(a)(1). See id. (citing Mathis v. United States, 579 U.S. 500, 519 (2016)). As we explained, this change amounted to a constructive amendment because "the [forfeitable] property was an element of the crime rather than a means of committing it." Id. at 200 (internal citations omitted).

Katana's case is distinguishable from de Leon-De La Rosa because the district court here instructed the jury on the elements of 18 U.S.C. § 1951, which is precisely the statutory offense charged in the indictment. The government's arguments at Katana's trial also focused on that offense and no other. Accordingly, there was no constructive amendment. See Simon, 12 F.4th at 34 (no constructive amendment when "the statutory violation remains the same" (quoting Mubayyid, 658 F.3d at 51)).

### 3. Katana's Prejudicial Variance Claim

We now turn to Katana's argument that there was a "variance from the indictment, which 'occurs when the charging terms remain unchanged but . . . the facts proved at trial are different from those alleged in the indictment.'" Fornia-Castillo, 408 F.3d at 66 (citation omitted). Relying on many of the same arguments that he advances in support of his constructive amendment claim, Katana asserts that a variance occurred because the indictment charged him with conspiring to rob Wilson, but the government's theory at trial was that he had conspired to rob O'Brien or, alternatively, Wilson's business in her presence. For the reasons we lay out below, we conclude that there was no variance here, and, even if there had been, Katana has failed to demonstrate prejudice.

As we explained earlier, a commonsense reading of the indictment indicates that Wilson was the target of the robbery in connection with his business. The government's evidence at trial showing that Katana and his co-conspirators sought to rob Wilson of his business assets (the tobacco and marijuana glassware) therefore did not amount to a variance. Additionally, the government never argued at trial that Katana and any of his co-conspirators planned to rob O'Brien. Rather, the government introduced evidence from which a rational jury could conclude that the conspirators planned to unlawfully take Wilson's property at

6 French Road, by actual or threatened force, regardless of whether he or someone else (such as O'Brien) was home at the time.  See infra, Part II(B).

Moreover, even if the government's arguments varied from the indictment, Katana has failed to establish prejudice.  He argues that, because of "the narrowly-drawn charge" in the indictment, his "defense at trial focused intently on whether the evidence . . . was sufficient to" establish that he conspired to rob Wilson -- that is, to take Wilson's property by force or threat of force from "Wilson's person."  Katana also suggests that, had he been aware of the government's intent to present its "alternative theory" at trial -- that Katana conspired to rob Wilson's home business in the presence of a third party -- "defense counsel may well have taken steps to inquire about the scope of . . . Katana's knowledge regarding . . . Wilson's alleged business operations at 6 French Road, about . . . O'Brien's whereabouts or her residence at that location, or about . . . [the presence of] any other person . . . at 6 French Road on March 25, 2019."  For example, "the defense may have sought to highlight for the jury the lack of evidence regarding . . . Katana's knowledge of those matters."  Katana's claim of prejudice is thus, at its core, that the alleged variance deprived him of "the right to have knowledge of the charge sufficient to prepare an effective defense and avoid

surprise at trial." Vega-Martínez, 949 F.3d at 51 (cleaned up) (quoting Godfrey, 787 F.3d at 79).

We are not persuaded by this claim for several reasons. First, Katana's trial strategy does not support his claim of surprise. Throughout the trial, Katana disputed that he believed anyone would be at home at 6 French Road. For example, during his opening statement, Katana's counsel argued that the central issue before the jury was whether Katana "agree[d] with others to commit a robbery while someone was there." (Emphasis added.) He contended that the evidence the jury would hear would "fall far short of showing that . . . Katana knew or understood that someone was in the house." (Emphasis added.) To be sure, his attorney argued at one point that Katana believed Wilson, "the supposed target of the robbery," would not be home at the time. But throughout his opening statement, he focused on whether Katana and his co-conspirators believed anyone would be home. Further, during cross-examination of the government's key ATF witness, Katana's counsel ably highlighted the absence of any discussion among the conspirators that suggested they believed someone would be at 6 French Road.[17]

_____

[17] We also note that, although Katana did not cross-examine Connors about how loudly O'Brien was playing her music that afternoon, he did ask O'Brien herself whether she thought that her music could be heard outside of the house. His cross-examination of O'Brien thus provides additional support for our conclusion

In sum, the record does not suggest that Katana was "so in the dark about the" government's prosecution theory at trial that "[]he could not prepare a defense or plead double jeopardy to stop a second prosecution for the same crime." United States v. Greaux-Gomez, 52 F.4th 426, 439 (1st Cir. 2022) (alteration in original) (citation omitted); see United States v. Moore, 198 F.3d 793, 796 (10th Cir. 1999) (finding no prejudicial variance where indictment "named the victim [of the bank robbery] as Brent Byers" even though the true victim was his wife because defendant "was not misled by the variance," as he "was aware of the charges against him and presented his defense with the knowledge that Anne Byers was the alleged victim"). Accordingly, based on the specific facts here, any shift in the identity of the target of the robbery from Wilson personally to Wilson's home business was not prejudicial. Cf. United States v. Orrego-Martinez, 575 F.3d 1, 7 (1st Cir. 2009) (finding no prejudicial variance despite government's "shift as to the [identity of the] victims" of defendant's fraud scheme because victims' identity was not an element of the charged offense); United States v. Von Stoll, 726 F.2d 584, 586-87 (9th Cir. 1984) (holding same where defendant was charged "with transporting money taken from McCallum [but] the proof showed it was taken from . . . McCallum's partner," because

that Katana was not surprised by the government's theory of the case at trial.

- 32 -

defrauded person's identity "is irrelevant" to offense charged and "[t]he inconsistency did not affect [the defendant's] substantial rights").

Second, our decision in United States v. Dellosantos, 649 F.3d 109 (1st Cir. 2011), which Katana relies on heavily, is consistent with our conclusion here. The two defendants in that case challenged their convictions for conspiracy to distribute cocaine and marijuana on the basis that the evidence at trial "suggest[ed] only that they participated in a conspiracy to distribute cocaine, and not the . . . conspiracy to distribute both cocaine and marijuana that was charged in the indictment." Id. at 116. Analyzing this challenge through the lens of a prejudicial variance, we agreed that the evidence at trial "pointed to at least two distinct conspiracies" -- a Massachusetts-based conspiracy to distribute cocaine only and a Maine-based conspiracy to distribute cocaine and marijuana -- rather than a "single overarching conspiracy covering all the relevant drug dealing." Id. at 119, 121. We concluded that there was a variance "between the conspiracy charged and the [separate cocaine-only] conspiracy for which there was sufficient evidence that the [d]efendants [had] actually joined." Id. at 121. We further concluded that the variance was prejudicial because the defendants "were, at the very least, deprived of adequate notice of the charges against them[]

and . . . therefore limited in their ability to prepare a defense at trial." Id. at 125.

Dellosantos is readily distinguishable from the case before us. The issue in Dellosantos was whether the defendants had agreed to join the broader conspiracy charged in the indictment rather than a smaller, narrower one proved at trial. See id. Katana does not argue that the evidence in this case points to multiple conspiracies, as it did in Dellosantos. See id. at 119, 121. Rather, he suggests that, like the Dellosantos defendants, he too has been prejudiced by alternative theories of prosecution advanced by the government. But as we have already concluded, he has not established that the alleged variance here was prejudicial because the record shows that he had sufficient notice of, and was able to defend himself against, the government's theory at trial.

Because Katana has failed to demonstrate that the alleged variance was prejudicial, he has failed to demonstrate grounds for reversal. See United States v. Chan, 981 F.3d 39, 52 (1st Cir. 2020) ("A variance alone . . . does not necessitate disturbing a conviction; rather, 'a variance is grounds for reversal only if it is prejudicial . . . .'" (quoting Dellosantos, 649 F.3d at 116)); see also Vega-Martínez, 949 F.3d at 51 ("A variance . . . is permitted unless it affects the defendant's substantial rights . . . ." (cleaned up) (quoting Godfrey, 787 F.3d at 79)).

- 34 -

## B. Sufficiency of the Evidence

We review Katana's preserved sufficiency of the evidence claim de novo. See United States v. Daniells, 79 F.4th 57, 71 (1st Cir. 2023). In conducting our review, "we take the evidence in the light most favorable to the government, draw all reasonable inferences [in the government's favor], and ask whether a rational jury could find that the government proved all the elements of the offense beyond a reasonable doubt." United States v. Fuentes-Lopez, 994 F.3d 66, 71 (1st Cir. 2021); see Daniells, 79 F.4th at 71. "To uphold a conviction, [we] need not believe that no verdict other than a guilty verdict could sensibly be reached, but must only satisfy [ourselves] that the guilty verdict finds support in a plausible rendition of the record." Fuentes-Lopez, 994 F.3d at 71 (quoting United States v. Sabean, 885 F.3d 27, 46 (1st Cir. 2018)). Thus, the jury's "verdict must stand unless the evidence is so scant that a rational factfinder could not conclude that the government proved all the essential elements of the charged crime beyond a reasonable doubt." Simon, 12 F.4th at 24 (citation omitted).

Katana presents two sufficiency challenges. First, he argues that the evidence at trial was insufficient to prove that he knew or believed that Wilson would be home at 6 French Road on March 25, 2019. We reject this argument because Katana's belief (or lack thereof) that Wilson in particular would be home at the

- 35 -

time of the planned robbery is not an element the government was required to prove. The Hobbs Act does not require that a conspirator intend to take an individual's property in the presence of that same individual. See 18 U.S.C. § 1951(b)(1) ("'[R]obbery' means the unlawful taking or obtaining of personal property from the person or in the presence of another . . . ." (emphasis added)). The jury was therefore permitted to convict Katana if it concluded beyond a reasonable doubt that Katana had conspired to unlawfully take Wilson's property "in the presence of another," such as O'Brien, by threatened or actual force. Id. And, as Katana acknowledged at oral argument, the evidence could plausibly support the conclusion that the conspirators believed someone might be at the residence.

For example, on the morning of the planned robbery, Johnson asked Melendez: "[Y]ou got the thing or I'm bringing mine?" Melendez responded: "Well, we finding out right now. He might not -- he probably not even there, so I'ma find out right now." Immediately, though, Melendez added: "Bring yours . . . just in case." And when Johnson asked if Melendez was "sure," Melendez answered affirmatively and unequivocally: "Bring one." The jury could have reasonably concluded from this conversation that Melendez and Johnson were referring to the firearm that was subsequently found in the car with Johnson in the Home Depot parking lot. The jury could have further concluded that Melendez

and Johnson discussed bringing the firearm because they anticipated the possibility that -- although Wilson was "probably" not home -- someone else might be.[18]

Additionally, Rachel Connors testified that, despite being partially deaf, she could hear loud music playing from inside 6 French Road when she walked up the front steps, just moments after Katana had stolen boxes from the porch. Connors also testified that O'Brien's car was parked in the driveway at the time. The jury could have inferred that Katana likely heard the same music and noticed the same car, tipping him off to the presence of someone inside the house.

Further, after Katana stole boxes from the porch, he and Melendez proceeded to Home Depot. At Home Depot, they purchased a crowbar, screwdriver, and razor blades to facilitate the break-in. Crediting the testimony of Connors indicating that there were obvious clues that someone was in Wilson's house that afternoon, the jury could have found that Katana nevertheless took the final

---

[18] We note that Katana makes no argument on appeal that he was unaware either that Melendez and Johnson discussed bringing a firearm or that Johnson ultimately brought a firearm with him. Regardless, to "be a willing participant" in the charged conspiracy, Katana "need not [have] 'know[n] the exact scope and extent of the collective endeavor'" because he knew "its essential nature." United States v. Tum, 707 F.3d 68, 74 (1st Cir. 2013) (citation omitted); see United States v. Orlando, 819 F.3d 1016, 1022 (7th Cir. 2016) (noting that, to convict a defendant charged with a Hobbs Act conspiracy, "the government must show that [he] knew the essential nature and scope of the charged conspiracy and that he intended to participate in it").

steps to proceed with the robbery and would have done so had the police not intercepted him and his co-conspirators. Such a finding would not have been "unreasonable, insupportable, or overly speculative" in light of the evidence. Daniells, 79 F.4th at 71 (citation omitted); see Simon, 12 F.4th at 24 ("[W]e must honor the jury's evaluative choice among plausible, albeit competing, inferences." (citation omitted)). In sum, the jury could have reasonably concluded from the evidence at trial that the conspirators were aware of the possibility that Wilson or someone else might be at 6 French Road.

The evidence here is therefore distinguishable from that in United States v. Acosta, 595 F. Supp. 2d 282 (S.D.N.Y. 2009), which Katana cites. In that case, a defendant moved for a judgment of acquittal after being convicted of, among other offenses, participating in an attempted Hobbs Act robbery. See id. at 284-85. Because the evidence indicated that he and his co-conspirators had at some point agreed to a "new plan" in which they would not "rob [the target] but rather . . . break into his empty house and search for the cash," the district court concluded that the defendant had "at most aided and abetted an attempted burglary." Id. at 293. The government had not offered any evidence that the conspirators "expected anyone to be present at [the target]'s home during the break-in," and instead the evidence suggested that the crew selected a particular night for the planned break-in

- 38 -

"precisely because they thought the house would be empty." Id. at 294. "The plan did not . . . even suggest a likelihood that non-participants would be present . . . ." Id. Additionally, the district court noted the critical fact that the defendant "was not at [the target]'s house or in the crew's van [on the] evening" that two of his co-conspirators broke into the residence. Id. at 295. The district court acknowledged that, when the homeowner unexpectedly came home, one of the defendant's co-conspirators gave another co-conspirator "a gun and told him to point it at [the victim] and tell him to freeze." Id. However, that these two conspirators "may have undertaken their own actions to transform the burglary into a robbery or attempted robbery," the district court explained, was not enough to "attach sufficient specific intent for such an act to [the defendant]." Id. For these reasons, the district court determined that a rational jury could not reasonably conclude that the defendant had aided or abetted the attempted Hobbs Act robbery and granted the defendant's motion with respect to that charge. See id. In this case, by contrast, the government introduced evidence from which a jury could reasonably conclude that Katana anticipated the possibility that someone might be home at the time of the break-in.

Second, Katana argues that, under the government's "unindicted 'business robbery' theory of prosecution," the evidence was insufficient to establish that he was aware of

- 39 -

Wilson's business operations at 6 French Road.  In Katana's view, there was no evidence that he or any of his co-conspirators had been aware of Wilson's business or "had ever interacted with anyone about . . . Wilson's business in any way."  When "we take the evidence in the light most favorable to the government" and "draw all reasonable inferences" in the government's favor, we conclude otherwise.  Fuentes-Lopez, 994 F.3d at 71.

The jury heard evidence that Katana and Melendez planned the crime for almost a week and specifically targeted Wilson's house in Rockland.  Katana offers no alternative explanation as to why he and his co-conspirators chose 6 French Road, a residence about sixty miles away from Worcester, if not for their knowledge about Wilson's business, which was advertised online.  Further, Katana had stolen packages from the porch of 6 French Road when he and Melendez went to scout out the residence.  Those packages contained glassware from Wilson's business.  The jury could have therefore reasonably inferred, as the government suggests, that Katana and his co-conspirators "knew what they would find and intended to take" during the planned robbery.  Additionally, the evidence at trial suggested that Katana had a source for information about Wilson, and the jury could have reasonably concluded that source would have shared details about Wilson's home business.  In sum, a rational jury could have concluded that Katana and his co-conspirators planned a robbery at 6 French Road

because they were aware of Wilson's business there and the related valuable glassware.  See United States v. Correia, 55 F.4th 12, 33 (1st Cir. 2022) ("[T]he jury [is] entitled to draw reasonable inferences from the evidence as a whole." (citation omitted)).

Thus, we are satisfied "that the guilty verdict finds support in a plausible rendition of the record."  Fuentes-Lopez, 994 F.3d at 71 (quoting Sabean, 885 F.3d at 46).  Katana's claim that there was insufficient evidence to support his conviction therefore fails.

## III. CONCLUSION

For all these reasons, we **affirm** Katana's conviction.

**-Concurring Opinion Follows-**

**HOWARD**, <u>Circuit Judge</u>, **concurring**.  I join the panel opinion in full, noting especially that I agree with its reading of <u>Stirone</u> v. <u>United States</u>, 361 U.S. 212 (1960), and with its conclusion that any variance in this case did not prejudice Katana. I add a few words of my own to suggest a way to clear up some confusion that I believe may have found its way into our case law concerning constructive amendment and prejudicial variance.

Some of our prior decisions have acknowledged that "[t]he concepts of constructive amendment and variance are closer to a continuum than exclusive categories."  <u>United States</u> v. <u>Mueffelman</u>, 470 F.3d 33, 38 (1st Cir. 2006); <u>see</u> <u>United States</u> v. <u>Mubayyid</u>, 658 F.3d 35, 49 (1st Cir. 2011); <u>United States</u> v. <u>Rodríguez-Rodríguez</u>, 663 F.3d 53, 58 n.6 (1st Cir. 2011).  Despite this recognition, we may have also created an incentive for litigants to expend energy arguing that a case falls under one of those classifications -- constructive amendment or variance -- instead of the other.  We have done so by stating that "[a] constructive amendment is considered prejudicial per se and grounds for reversal.  [But v]ariance is grounds for reversal only if it affected the defendant's 'substantial rights.'"  <u>United States</u> v. <u>Fisher</u>, 3 F.3d 456, 462-63 (1st Cir. 1993) (citation omitted).  Seemingly then, if an appellant persuades us that there has been a constructive amendment of the indictment, the conviction will automatically be reversed.

- 42 -

I use the word "seemingly" because I am unaware of any case in which we have followed this analytical path to its destination. We recognized the absence of such a case in United States v. Brandao.[19] 539 F.3d 44, 59-60, 59 n.9 (1st Cir. 2008). And none has emerged since. It appears that we have employed language akin to "constructive amendments are considered prejudicial per se and grounds for reversal" on five occasions following Brandao (including today). See United States v. Andino-Morales, 73 F.4th 24, 39 (1st Cir. 2023); United States v. Davis, 717 F.3d 28, 34 (1st Cir. 2013); Rodríguez-Rodríguez, 663 F.3d at 58; United States v. Celestin, 612 F.3d 14, 24 (1st Cir. 2010). Yet in "every one of these cases, [we] found no constructive amendment and thus no error."[20] Brandao, 539 F.3d at 59.

---

[19] Brandao considered two possible exceptions, United States v. Iacaboni, 363 F.3d 1 (1st Cir. 2004), and United States v. Santa-Manzano, 842 F.2d 1 (1st Cir. 1998), but found that both could be readily distinguished. 539 F.3d at 59-60. Only Iacaboni compels further elucidation here. That case did not involve a constructive amendment challenge to a conviction. Instead, the defendant claimed that he pled guilty to promotional money laundering, see 18 U.S.C. § 1956(a)(1)(A)(i), but was ordered to forfeit certain funds on a theory of concealment money laundering, see id. § 1956(a)(1)(B)(i). Iacaboni, 363 F.3d at 7. We agreed. And although we labeled the situation a "per se prejudicial 'constructive amendment,'" id., it is readily apparent how the defendant was prejudiced in fact by being ordered to forfeit money not involved in the charge to which he pled guilty.

[20] United States v. de Leon-De La Rosa, 17 F.4th 175 (1st Cir. 2021), a recent case where we found constructive amendment, was on plain error review and therefore did not presume prejudice per our decision in Brandao, discussed below. Id. at 198-200, 201.

- 43 -

Our use of "prejudicial per se" language "seems to have begun with dicta in United States v. Dunn, 758 F.2d 30, 35 (1st Cir. 1985)." Id. There, we said:

> A constructive amendment "occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecution or court after the grand jury has last passed upon them." Gaither v. United States, 413 F.2d 1061, 1071-72 (D.C. Cir. 1969). An amendment of the indictment is considered prejudicial per se and grounds for reversal of a conviction whether it is brought about by a literal alteration of the words of the indictment, Ex Parte Bain, 121 U.S. 1 (1887), a jury instruction which modifies the offense charged in the indictment, Stirone v. United States, 361 U.S. 212 (1960), or the admission of evidence of an offense not charged by the grand jury, United States v. Beeler, 587 F.2d 340 (6th Cir. 1978).

758 F.2d at 35.[21]

Yet neither of the Supreme Court decisions cited in Dunn instruct that a constructive amendment must be considered prejudicial per se and grounds for automatic reversal. Our unanimous opinion today ably explains why Stirone does not dictate as much. See Slip Op. at 20-21. And Ex Parte Bain, a habeas case involving a literal alteration to an indictment, stands in modern times for the "settled proposition of law" that "an indictment may not be amended except by resubmission to the grand jury, unless

---

[21] We have previously noted that Dunn appears to be the source of our obfuscating practice of referring to literal alterations to the indictment as "constructive" amendments. See United States v. Dowdell, 595 F.3d 50, 67 (1st Cir. 2010).

the change is merely a matter of form." United States v. Cotton, 535 U.S. 625, 631 (2002) (quoting Russell v. United States, 369 U.S. 749, 770 (1962)). The case is therefore of little help in determining whether a constructive amendment is grounds for an automatic reversal.

Similarly, the Supreme Court has never listed constructive amendment as a structural error -- the kind of error that "should not be deemed harmless beyond a reasonable doubt," Weaver v. Massachusetts, 582 U.S. 286, 294 (2017). See, e.g., Washington v. Recuenco, 548 U.S. 212, 218 n.2 (2006) (listing structural errors); see also Brandao, 539 F.3d at 60-61 ("[T]here are good reasons not to extend the list of structural errors to include constructive amendments."). Indeed, as Judge Easterbrook points out, "the phrase 'constructive amendment' has never been used by a single Justice in a criminal case." United States v. Withers, 960 F.3d 922, 935 (7th Cir. 2020) (Easterbrook, J., concurring).

Taking all this into consideration, we would do well in the appropriate case to acknowledge that constructive amendments are not prejudicial per se, despite our past dicta to the contrary. In many ways, this is the logical corollary of our decision in Brandao. The relevant question there was whether a constructive amendment automatically satisfies the third prong of plain error review -- that the error "'affect substantial rights,' which 'in

most cases . . . means that the error must have been prejudicial.'" Brandao, 539 F.3d at 58 (first quoting Fed. R. Crim. P. 52(b); and then quoting United States v. Olano, 507 U.S. 725, 734 (1993)). We determined that it does not. See United States v. Taylor, 848 F.3d 476, 495-96 (1st Cir. 2017) ("In [Brandao], we confronted the question of whether or not constructive amendments are prejudicial per se and determined they are not.").

Brandao is not an outlier among the circuit courts. In fact, there are seemingly no longer any circuits that require automatic reversal for a constructive amendment on plain error review. See United States v. Banks, 29 F.4th 168, 177-78 (4th Cir. 2022). I see no compelling reason why we should not adopt that same approach even for claims of constructive amendment that have been properly preserved.[22] See 3 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 516 (5th ed. 2023)("Once courts are willing to review constructive amendments with the traditional plain error analysis without the presumption of prejudice, it is a small step to harmless error review.").

---

[22] The Supreme Court "has several times declined to resolve whether 'structural' errors . . . automatically satisfy the third prong of the plain-error test." Puckett v. United States, 556 U.S. 129, 140 (2009). Brandao gives rise to the inverse question: Whether errors that do not automatically satisfy the third prong of the plain error test can be structural errors. But even if the answer is yes, it does not follow that a constructive amendment is necessarily a structural error.

- 46 -

To be sure, the violation of certain constitutional rights that are related to the concept of constructive amendment can lead to the automatic reversal of a conviction. For example, if a defendant is convicted based on evidence that does not satisfy the elements of the crime charged by the grand jury, an insufficiency-of-the-evidence claim will secure a reversal. See, e.g., United States v. Pothier, 919 F.3d 143, 148-49 (1st Cir. 2019); see also Price v. Georgia, 398 U.S. 323, 331 (1970) (refusing to apply harmless error review to violation of a defendant's double jeopardy right). But by dispelling the notion that constructive amendments are prejudicial per se, we can remove the unjustified incentive that has developed for the parties to spend their energy arguing over how to divide a continuum into exclusive categories. See Mueffelman, 470 F.3d at 38.

In this case, there can be no serious contention that Katana was prejudiced by any incongruity that existed between the indictment and the trial evidence or jury instructions. See Slip Op. at 30-36. Under my view of the proper reading of our cases, that is enough to foreclose his "constructive amendment" argument.